ALVIN E. CROCKER

*v.*

WILLIAM F. MANLEY.

282:35 LRA

*Filed at Ottawa November 23, 1896.*

1. FRAUD—*when false representations constitute fraud.* To constitute fraud false representations must relate to a material fact, and be made with a knowledge of their falsity and for the purpose of inducing the other party to act thereon, and such other party must actually act to his injury, in the reasonable belief that the representations are true.

2. SAME—*what statements are merely matters of opinion, and not facts.* Statements by a mine owner made to induce another to purchase stock therein, that the mine was rich in silver, would pay twenty to one hundred per cent dividends, and that there was enough ore on the dump at the mine to pay the par value of the stock, are matters of opinion only, and though false do not constitute fraud.

3. SAME—*effect of reliance by purchaser upon his own observations.* A deed to property made in payment for stock in a silver mine will not be set aside for alleged false representations as to the value of the mine, where the grantor, before making the deed, examines the mine for himself, expresses himself as entirely satisfied, and, in fact, acts on his own judgment.

APPEAL from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

This was a bill in equity brought by William F. Manley, against Alvin E. Crocker, (the appellant,) the San Javier Mining and Milling Company and T. C. Mills, to set aside conveyances from Manley to Crocker, and from the latter to Mills, of certain real estate in Oak Park, a suburb of Chicago, claimed to be worth $22,500, which conveyances, it was alleged, were procured by fraud and false representations. The Superior Court decreed in favor of the complainant, and from that decree Crocker appeals.

The record is somewhat voluminous, but the principal question presented is whether the evidence sustains the decree. In the year 1892, the appellant, who has for a

number of years resided in Richmond, Indiana, purchased a silver mine near La Ventura, in Mexico. After making the purchase he organized a corporation under the laws of New Jersey, with a capital of $500,000. The appellee, Manley, who also resided at Richmond, learned of the mine through a man named Leonard, and entered into negotiations with said Leonard, who acted as agent for the company or Crocker, to purchase stock in the company. Leonard, as the complainant testified, made various statements to him in regard to the mine and its rich qualities, and he agreed to take one thousand shares of stock, provided Crocker's statements agreed with those of Leonard when he returned from Mexico. Crocker returned about March 6, 1893, and complainant had an interview with him at Leonard's store, where Crocker made a full statement in regard to the mine. Manley requested that said statement be reduced to writing, which was done within a few days, and upon receiving the statement in writing Manley took one thousand shares of stock for $5000 and gave two notes in payment,—one for $2000, payable to Leonard, and the other for $3000, payable to Crocker. On the 11th day of March Manley took one thousand shares more of stock at five dollars per share, and executed his note for the same. On the 23d day of March he agreed with Leonard to take one thousand shares more, but the stock was not issued until in July. In the last week in April, Manley went to Mexico for the purpose of making a personal examination. Upon arriving at the mine he made an examination of the property, went into the shafts, took specimens of the ore from the shafts and dumps, and after making all the investigation and examination he desired he returned to Chicago and had the specimens assayed, and expressed himself well satisfied with the mine and its prospects. Some time after Manley returned he made an effort to sell his Chicago property for the purpose of raising money to pay his notes given for stock, but not

being able to do so, he proposed to Crocker to return the stock and cancel the notes, but Crocker expressed a desire to have him remain in the company, and on June 10 submitted the following proposition:

"*William F. Manley:*                "RICHMOND, IND., *June 10, '93.*

"DEAR SIR—I will give you $75 a front foot for lots 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50,—300 feet fronting on Madison street and 140 feet on Waller avenue, Austin, a suburb and part of Chicago, Illinois,—making the total price $22,500, less the school fund mortgage and that portion of the mortgage held by the Home National Bank of Chicago, which may apply to and cover on lots 39 and 40, as shown by plat submitted to me this day; also less the taxes for this year, due in August or September next, and the assessments for improvements heretofore made upon the lots by the city, and the interest which has accrued up to the date of transfer. The payment shall be: I will surrender two notes which I hold against you, for $2500 each, and take up the notes which Valentine Leonard holds against you, of $5000, and pay the balance, whatever it may be, in stock at par in the San Javier Mining and Milling Company of La Ventura, Mexico, certificates for said stock to be issued to you as soon as the titles are all right and transfers made by a good and sufficient deed of general warranty.

"Yours truly,                ALVIN E. CROCKER."

On June 13 following, Manley accepted the proposition in writing, as follows:

"I hereby accept the above proposition with the following stipulations: The said Crocker is to pay a certain note for $3000, which has been discounted at the First National Bank, and given by me to him on March 3, 1893, due in six months from date, and assume the payment of $1000 of the mortgage which covers on lots 39 and 40, held by the parties named above.

W. F. MANLEY."

On the 3d day of July, 1893, in pursuance of the contract, Manley conveyed the property to Crocker, who issued him one thousand shares of stock as specified in the contract. At the same time the one thousand shares of stock purchased through Leonard on March 23 were also issued and delivered to Manley. A mill having been

erected at the mine, the company, through Crocker, as manager, operated the mine during the summer and a part of the fall of 1893, but the results did not prove satisfactory and the work at the mine was discontinued. In the meantime, one Ewing, who had been in charge of the mining under Crocker, was discharged, and on the 9th day of November he wrote Manley a letter, in which he informed him that he had been imposed upon,—that the mine was worthless, etc. Finally, in the month of March, 1894, Manley tendered back the stock he held in the company and demanded a reconveyance of the Chicago property. This being refused he filed this bill.

The fraudulent representations alleged in the bill are substantially as follows: That there was a certain valid corporation by the name of the San Javier Mining and Milling Company, duly organized under the laws of the State of New Jersey, owning and operating a certain silver mine, and mill and machinery for operating the same, situate near La Ventura, Mexico; that said defendant, Crocker, was treasurer of said corporation and manager of the mill and mines owned and operated by the mining and milling company in Mexico; that said Crocker was the owner of a large proportion of the stock of the company; that said Crocker, by himself and agents, and the defendant company, by its agents, falsely and fraudulently represented to your orator that said mines were rich with silver, and that they would pay a dividend of from twenty to one hundred per cent per annum upon the par value of the stock of said company; that there was enough silver ore on the dump at the mines to pay the par value of all of the stock that had been issued by the said mining and milling company, which was one-half million dollars; that the vein of ore in said mine was sixteen feet in width and assayed over $1000 per ton; that the depth of the vein of ore was two hundred feet, and the assays of the ore ran in richness from thirty ounces troy per ton to fifteen hundred ounces; that said vein

ran from east to west, lacking forty feet of one-half mile, and varied in width from six to fifty feet; that the manager of the mine for the company said unqualifiedly that he would pay one hundred per cent dividend, using the ore alone then developed and on the dump; that he also stated that to reduce fifty tons per day you could not use up the body of ore on hand in five years, without going any deeper in the shafts; that the said Crocker, the mining and milling company, and their agents and representatives, further represented that the mine was what was known as a fissure vein, and that it grew richer the deeper you went into the mine; that there never had been such a development of rich ore in such a large body as was shown by the shafts in this mine; that they had recently sent a car-load of ore taken from their said mine to a smelter in Monterey, Mexico, which assayed sixty-eight ounces per ton of two thousand pounds; that the average assays of the ore of said mine were over two hundred ounces per ton; that they had a proposition from bankers in New York that they would list the stock on exchange, and capitalize the company at $10,000,000, and dispose of all the stock within sixty days, if said mine paid twenty per cent on the stock the first year; that it was further represented that said defendants had at that time machinery in Mexico for the mill, of fifty tons capacity per day; that they had shipped the boiler and the engine from Richmond, Indiana, and the stamping machinery from Brooklyn, New York; that all of said machinery was then in the city of Mexico and would be put up and operated within ninety days from that time, and from thenceforward the company would pay dividends upon the stock. It is also alleged in the bill, that in the first instance, and before the issuance of said stock and acceptance of it by your orator, the said defendant, Crocker, made said statements to your orator orally, but at the time said he would, in addition to that, make a written statement covering the same statements that he

made orally to your orator, and in pursuance of the said statement the said defendant, Crocker, made and signed a certain written statement, in which he detailed in part the representations that he had made to your orator orally, in order to induce him to purchase and accept one thousand shares of stock, and delivered said written statement to your orator, which is in the words and figures following, to-wit:

*"March 10, 1895.*

*"Wm. F. Manley, Esq., Richmond, Ind.:*

"DEAR SIR—Enclosed I hand you cost of reduction of ore from the San Javier mines in Mexico, which I wish you to examine and which I hope may meet with your approval, because it is very conservative and can be verified at any time, and, with the assurance I have from our manager, can be and will be increased five-fold the first year, the ore-body developing a vein of ore sixteen feet in width and assaying way up into the thousands per ton. The depth of this vein of ore is now about two hundred feet, and the assays of the ore to run in richness from thirty ounces troy per ton to fifteen hundred. This vein runs due east and west, lacking forty feet of half a mile, and varies in width from six to fifty feet. Our manager says, unqualifiedly, that he will pay one hundred per cent dividend, and using the ore alone now developed and on the dump. Using his own language: 'If you reduce fifty tons a day you cannot use up the body of the ore now on hand, and you need not go one inch deeper in the shaft.' You are perfectly aware that all mines, especially fissure mines, grow richer the deeper you go, and the general expression in regard to the San Javier mines is, that there has never been such a development of rich ore in such a large body as is shown in the shafts of this mine. Besides the statement which I give of cost of reduction, showing such a large profit, I would say, that the difference in the wages between Mexico and Colorado will make a difference in favor of Mexico, guaranteeing itself an immense dividend. Then all of our expenses to Mexicans is paid in Mexican money, while all of our receipts will be exchange, bearing at least fifty per cent premium. We lately sent a car-load of ore taken from the mine to the Monterey smelter, which assayed sixty-eight ounces per ton of two thousand pounds. Our general assays of number of ounces per ton reaches now over two hundred ounces per ton. There is not one feature in regard to this mining prop-

erty but what is indicative of very large dividends. We have no ice, snow or sleet; can work 365 days in a year, and if we do our part, which our own interest compels us to do, there is no doubt but the returns for every dollar invested in this stock will bring larger returns than you have ever received before. Indeed, we have a proposition from bankers in New York, if we pay the dividends we know we can, that they will list the stock on the exchange and capitalize the company at $10,000,000, and dispose of all the stock inside of sixty days.

"Yours very truly,

ALVIN E. CROCKER, *Treasurer.*"

S. S. GREGORY, for appellant:

Where the vendor and vendee are dealing at arm's length with each other, representations of the former as to the cost of his property, even though false and made with a view to deceive, will furnish no ground of action. *Hauk* v. *Brownell*, 120 Ill. 161.

If the neglect to make reasonable examinations would preclude a party from rescinding a contract on the ground of false and fraudulent representations, *a fortiori* is he precluded when it appears that he did make such examination and relied on the evidences furnished thereby, and not upon the representations. *Farnsworth* v. *Duffner*, 142 U. S. 43.

WALTER OLDS, C. F. GRIFFIN, and W. S. OPPENHEIM, for appellee:

It is enough, to entitle one to have a transaction set aside, to show a fraudulent representation as to any part of that which induced him to enter into the contract sought to be rescinded. Kerr on Fraud and Mistake, 334.

When a party ignorant of the real facts, and having no ready means of information, makes a purchase or enters into a transaction as to the subject matter of which representations have been made which are material, the law will presume, as a matter of fact, that he relied on them. *Hicks* v. *Stevens*, 121 Ill. 186.

There are cases in which even a false assertion of an opinion will amount to fraud, the reason being, that under the circumstances the other party has a right to rely upon it without bringing his own-judgment to bear. Cooley on Torts, 484.

Where a sale is of property at a distance, so that the purchaser has no means at hand of ascertaining the truthfulness of the vendor's representations, the vendee may rely upon their truth and have redress if they are shown to have been materially false. *Borders* v. *Kattleman*, 142 Ill. 96.

Representations of future earnings, when made in good faith, will not amount to fraud; but when such representations are made in bad faith, with the design to deceive and mislead, by one who is possessed of superior knowledge on the subject, although mere expressions of opinion, they are still a fraud, and action may be predicated thereon. *French* v. *Ryan*, 62 N. W. (Mich.) 1016.

Mr. JUSTICE CRAIG delivered the opinion of the court:

In regard to the allegations in the bill as to the organization of the company, its ownership of the mines, stock owned by Crocker, and that he was treasurer and manager, there is no controversy, it not being claimed that there was any falsity as to these averments. In reference to a large portion of the other averments of fact set up and relied upon in the bill, it will be found, upon due examination, that in the main they are not representations of fact, but, on the other hand, they are mere matters of opinion. Under the latter head may be mentioned the following: That the mines were rich with silver, and that they would pay a dividend of from twenty to one hundred per cent; that there was enough silver ore on the dump at the mines to pay the par value of the stock, and other like statements. These allegations of mere matter of opinion, as will be seen from the authorities hereinafter referred to, whether false or true, do not

form a basis upon which an action can be founded. There are, however, some four or five allegations of fact, as contradistinguished from allegations of opinion, which we will consider.

In regard to the allegations that the vein runs from east to west, lacking forty feet of a half mile, that it varies in width from six to fifty feet, and that the depth of the vein is two hundred feet, from an examination of the testimony of the defendant and the complainant, and the superintendent, Ewing, and the report of Bridge, it will be found such allegations were substantially correct.

The next allegation of fact is, that the mine was what was known as a fissure vein. Crocker testified that the vein was a fissure vein, as that term is understood. He testified: "A fissure vein, according to Hughes' dictionary, is a longitudinal opening with a foreign substance in it. The vein is a fissure vein in the San Javier and Guadalupe mines." In this he seems to be corroborated by Bridge and contradicted only by Ewing, and Ewing's testimony is contradicted by his statement to Manley at the time he visited the mine. Under the evidence it can not be said that this statement was false.

The next allegation of fact is, that a car-load of ore taken from the mine had been sent to the Monterey smelter, which assayed sixty-eight ounces per ton. The defendant, Crocker, testified that, before the statement was made, and before he incorporated it in his written statement to Manley, Jaurequeberry, the manager, informed him of the fact, and that Ewing, who was also in charge of the mines, corroborated the statement. The statement was therefore made by the defendant in good faith, believing it to be true. Whether the statement was true or false is left in doubt from the evidence. A car-load of ore was shipped to Monterey, but whether it was shipped from the mine in question or some other mine is left in doubt from the evidence. Ewing testified that he shipped the ore from the Incarnacion mines,

while the witness Shope testified that he shipped a half car-load, but not from the mine in question. It may be true that this statement was false, but there is so much uncertainty and doubt in regard to what the fact really was that it would not be safe to convict a person of fraud on such uncertain testimony.

The next allegation of fact was, that "our general assays of number of ounces per ton reaches now over two hundred ounces per ton." This statement was made before the defendant had worked the mine, and, of course, had reference to assays of samples of ore, and it appears from the testimony that assays of sample or specimen ores run higher than the ore when milled in large quantities, and we find no evidence in the record that the statement was not true.

There is also an allegation that there was a statement that the mill at the mines was to be capable of crushing fifty tons per day. The writing containing the defendant's statement contains no such averment, and Crocker testified that in all the conversations the talk was that the mill was to be a ten-stamp mill. In this he is corroborated by C. N. Harold, who testified that Crocker said he would have the mill running in ninety days and the capacity was to be thirty tons a day, and he intended to add more soon.

Under the facts established by the evidence, was the complainant entitled to a decree?

In *Southern Development Co.* v. *Silva*, 125 U. S. 247, the Supreme Court of the United States lays down the rule in regard to a recovery in a case of this character, as follows: "First, that the defendant has made a representation in regard to a material *fact;* secondly, that such representation is false; thirdly, that such representation was not believed by the defendant, on reasonable grounds, to be true; fourthly, that it was made with the intent that it should be acted upon; fifthly, that it was acted on by complainant to his damage; and sixthly, that

in so acting on it the complainant was ignorant of the falsity, and reasonably believed it to be true."

In regard to the kind or character of representations which are actionable, Bigelow on Fraud (vol. 1, p. 473,) lays down the rule that the representations must consist of matters of fact, and not of opinion.

In *Hemmer* v. *Cooper*, 8 Allen, 334, in speaking in regard to representations of a vendor in regard to the price he paid for real estate, the court said: "The representations of a vendor of real estate, to the vendee, as to the price which he paid for it, are to be regarded in the same light as representations respecting its value. A purchaser ought not to rely upon them, for it is settled that, even when they are false and uttered with a view to deceive, they furnish no ground of action.—*Medbury* v. *Watson*, 6 Metc. 246, and cases there cited." In *Holbrook* v. *Conner*, 60 Me. 578, the same doctrine is announced.

In *Hauk* v. *Brownell*, 120 Ill. 161, the cases from Massachusetts and Maine are cited with approval, and it is said (p. 163): "Where the vendor and vendee are dealing at arm's length with each other, the representations of the former as to the cost of his property, even though false and made with a view to deceive, will furnish no ground of action. They are looked upon merely as representations in regard to value, urged for the purpose of enhancing the price, and any purchaser who relies upon them is considered as too careless of his own interests to be entitled to relief."

In *Noetling* v. *Wright*, 72 Ill. 390, in speaking in regard to representations made by a vendor of property as to value, the price he has been offered or the good qualities of the property, it is said (p. 391): "Statements of this character do not in anywise relieve the purchaser from the responsibility of investigation into the true condition or value of the property about to be purchased. Such statements are only regarded as *gratis dicta*, and as is well said by Kerr in his work on Fraud and Mistake,

(p. 84:)   'A man who relies on such affirmations, made by a person whose interest might so readily prompt him to invest the property with exaggerated value, does so at his peril, and must take the consequences of his imprudence.'"

*Tuck* v. *Downing*, 76 Ill. 71, was a bill to rescind a contract for fraud where mining stock had been sold, as is the case here, and in discussing what may be regarded as mere opinion or a statement of fact it is among other things said (p. 95):   "The extravagant declarations of appellant after his return to Erie with the committee of examination, and made in their presence, that a silver mine with copper croppings was an inexhaustible mine of wealth; that the 'Aqua Frio' and 'Black Metallic' were the biggest things in Utah; that situated at the Fork Hills was greatly to their advantage; that they were well-developed mines, with well-defined veins; that he had never seen, in all his experience, such a 'blow out;' that a furnace ought to be erected at once, as the ore could be mined, and all the money put into it could be got out in a few months,—was mere gassing, and for the purpose of extolling what these men, through their committee, had seen, and could judge of the prospects and promise for themselves.   There was nothing unlawful, or prohibited in law, in all this.   It was after this examination and report by Camp and Barr the share was bought by complainant and the note in question executed, and a deed delivered and accepted for the property.   It is impossible their statement should be regarded as anything more than opinions, for no man can tell how a discovery like this may result.   Appellee could have understood them in no other sense, and the same may be said of the report of the committee.   They were opinions founded on facts as they appeared to them."   In *Southern Development Co.* v. *Silva, supra, Tuck* v. *Downing* was cited and a large portion of the opinion quoted with approval.

In *Farnsworth* v. *Duffner*, 142 U. S. 43, the same doctrine is announced.

There are other authorities holding to the same doctrine, but it will not be necessary to cite them here. It is manifest, under the law as established in the text books and in the decisions of the different courts, the complainant has failed to make out a case wherein he was entitled to recover.

There is another fact connected with the case that has an important bearing. It appears that in the latter part of April, 1893,—long before the conveyance was made which complainant seeks to set aside,—he determined to visit the mine for the purpose of determining for himself whether the mine was in fact what it was represented to be. He went there and was met by Ewing, the superintendent, O. P. Crocker, a son of the defendant, McGuire, and a Mexican. He made a thorough examination of the mine and its prospects. He walked over the grounds, went into the shafts, made selections of specimens for assay, placed each specimen in a small sack prepared for that purpose, marked each one and then placed the small sacks in a large one, and brought the specimens home with him and had them assayed. Upon his return he gave glowing accounts of the mine and the richness of its ore. The witness Harold detailed a conversation he had with Manley after his return, substantially as follows: "I think I asked him something about the quantity of ore he found, and as we looked at each sample I would ask him how much. He would make the remark that there were thousands of tons, and of others not quite so much, but he said there was plenty of ore, and again I think he made the statement to me that there was all the ore there that you could wish for." On cross-examination the witness said, referring to Manley: "He said there was a great quantity of ore on the dump, and that a number of assays were made from the dump which showed it to be very valuable, and judging

from the quantity on the dump he thought there was
$100,000 on the dump. He also based his opinion on what
he saw in the mine,—not only what he saw in the mine,
but the length of the mine where they could trace the
ore." Other witnesses corroborate these statements.

When the complainant was at the mine he was afforded
every facility to examine and investigate that he desired,
and the specimens which he brought away were of his
own selection. On the hearing the court found that no
fraud or deception was practiced on the complainant in
the selection of the specimens, nor were they tampered
with by the defendants, and the finding seems to be sus-
tained by the evidence.

In regard to the assays of the specimens and the faith
of the complainant in the mine if the specimens fairly
represented the ore therein, he testified:

Q. "Was the result of these assays satisfactory to you?

A. "They were.

Q. "They were such, were they not, that if you be-
lieved that that ore,—that these specimens fairly repre-
sented the ore in that mine,—you would still regard that
as a good mine, would you not?

A. "I felt quite well satisfied.

Q. "That would be your feeling now, would it not?

A. "Yes, sir.

Q. "If you felt that it was honest?

A. "The assays I had made, made an average of 228
ounces per ton.

Q. "Did that include those high grade assays?

A. "All of them.

Q. "The 371 and 2300 ounces?

A. "Yes, sir. And I consulted with some miners here,
who told me that if the mine did have that—well, we had
a perfect bonanza, and I was very much pleased with the
result of the assays.

Q. "And you would still feel, notwithstanding every-
thing else that has been said and done, if you were con-

vinced that the specimens you obtained represented an honest average of the mine, you would still feel that it was a good mine, would you not?

A. "I would. I think it would pay well."

The evidence in this record fails to show that the complainant was imposed upon in the selection of the specimens, or that any fraud was practiced on him after they were selected. If, therefore, the specimens failed to represent an honest average of the mine, the complainant, and he alone, was to blame.

In *Farnsworth* v. *Duffner, supra,* which was a bill for the rescission of a contract of purchase and to recover the money paid on the contract on the ground that it was entered into through false and fraudulent representations, in the decision of the case it was said: "Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities he will not be heard to say that he has been deceived by the vendor's misrepresentations." It is there, among other things, also said: "In *Ludington* v. *Renick,* 7 W. Va. 273, it was held that 'a party seeking the rescission of a contract on the ground of misrepresentation must establish the same by clear and irrefragable evidence; and if it appears that he has resorted to the proper means of verification, so as to show that he in fact relied upon his own inquiries, or if the means of investigation and verification were at hand and his attention drawn to them, relief will be denied.' In the case of *Attwood* v. *Small,* decided by the House of Lords, and reported in 6 Cl. & Fin. 232, 233, it was held that 'if a purchaser, choosing to judge for himself, does not avail himself of the knowledge or means of knowledge open to him or to his agents, he cannot be heard to say he was deceived by the vendor's representations.' And in 2 Pomeroy's Equity Jurisprudence (sec. 892) it is declared that a party is not justified in relying

upon representations made to him: '(1) When, before entering into the contract or other transaction, he actually resorts to the proper means of ascertaining the truth and verifying the statement; (2) when, having the opportunity of making such examination, he is charged with the knowledge which he necessarily would have obtained if he had prosecuted it with diligence; (3) when the representation is concerning generalities equally within the knowledge or the means of acquiring knowledge possessed by both parties.' But if the neglect to make reasonable examinations would preclude a party from rescinding a contract on the ground of false and fraudulent representations, *a fortiori* is he precluded when it appears that he did make such examination and relied upon the evidences obtained by such examination, and not upon the representations."

What was said in the case cited applies here. The complainant, apparently not being satisfied with the representations of Crocker in regard to the mine, proceeded to see and investigate for himself; and after making a thorough examination he had, so far as appears, as much information in regard to the mine and its richness as the defendant, Crocker, and he doubtless relied upon the information obtained rather than upon representations which had been made before.

In view of all the facts we do not think the evidence makes out a case which would authorize a court of equity to rescind the contract.

The judgment of the Superior Court will be reversed and the cause will be remanded, with directions to dismiss the bill.      *Reversed and remanded.*