DETERMINED IN

# THE SUPREME COURT

OF THE

# STATE OF UTAH

*(Continued from Volume 45)*

CAMPBELL v. ZION'S CO-OP. HOME BUILDING & REAL ESTATE CO. (and eight other cases).

No. 2626-2634. Decided December 12, 1914 (148 Pac. 401).

1. CORPORATIONS—STOCK SUBSCRIPTION—RESCISSION. In order to rescind a stock subscription, plaintiff must show that defendant has made a false representation in regard to a material fact not actually believed, on reasonable grounds, to be true, with intent that it should be acted upon, and that it was acted upon by plaintiff to his damage, while ignorant of the falsity thereof. (Page 13.)

2. FRAUD—STOCK SUBSCRIPTIONS—REPRESENTATIONS. Statements by officers of a corporation to purchasers of its treasury stock that they would get handsome returns, that the stock would double in value, and that they would not lose, and similar assurances, being mere opinions and beliefs, are not actionable *per se*, although untrue. (Page 14.)

3. CORPORATIONS—STOCK SUBSCRIPTIONS—REPRESENTATIONS. Statements by officers of a corporation, to induce subscribers to purchase stock, that the corporation was able to pay dividends out of its present holdings and property from the very start, and that dividends already paid had been earned and were justified, that the company guaranteed to pay a stated percentage of profit for a certain number of years, shown to be false, and made with intent to deceive, were ground for rescission of subscriptions made in reliance thereon. (Page 14.)

4. CORPORATIONS—STOCK SUBSCRIPTIONS—REPRESENTATIONS. False statements, made in bad faith by officers of a corporation to induce subscriptions to treasury stock, that the company then

Vol. 46—1

Campbell v. Zion's Co-op. H. B. & R. E. Co. (8 other cases), 46 Utah 1.

had sufficient assets with which to pay dividends from the start and to continue to pay them for a certain number of years without impairing the financial ability of the company, regardless of future earnings, constituted a sufficient ground for rescission of subscriptions made in reliance thereon, notwithstanding that dividends unearned and not paid out of the surplus proceeds were in fact received by the subscribers. (Page 16.)

Appeal from District Court; Second District; *Hon. J. A. Howell*, Judge.

Separate actions by A. M. Campbell, by Fred King, by P. B. Haslet, by George King, by Fred W. Voll, by Fred Breining, by B. F. Estes, by W. B. Haymond, and by B. F. Rugg against the Zion's Co-operative Home Building & Real Estate Company.

Judgment for plaintiff in each case. Defendant appeals.

AFFIRMED, with directions.

*A. A. Duncan* for appellant.

*A. G. Horn* and *Thos. Marioneaux* for respondents.

STRAUP, J.

These are actions to recover moneys from the defendant paid by the plaintiffs in the purchase of its capital stock. They are based on a rescission of contract for alleged deceit, misrepresentations, and fraud. There are nine cases—different plaintiffs, same defendant. The transactions and controversies arising out of them are similar. The cases were tried separately to the court. In each the plaintiff had judgment for the full demand of the complaint. The defendant appeals in each with separate transcripts and abstracts of the records. The cases were here argued and submitted together on briefs filed in the Campbell case and stipulated to apply to all of the cases.

The chief contention of the defendant is that the findings are not supported by the evidence, and that neither the state-

ments or representations as found, nor as shown by the evidence, are of such material and existing or past facts or events as to be actionable; that they relate to mere expressions of opinion and beliefs, and to future events and promises. The facts were found as alleged in the complaints.

The defendant was organized on the 26th of August, 1908, to do a general real estate business, buy and sell real estate, commercial stocks, and all kinds of merchandise used in the construction of buildings, and to carry on a general contracting and building business. Its capital stock was 250,000 shares of the par value of one dollar each, of which 80,420 shares were subscribed for and issued, and were fully paid at par. The balance of the stock was held as treasury stock, to be disposed of by the board of directors. The defendant owned considerable improved real estate, and had and operated two lumber yards at Salt Lake, and later, in 1911, established one at Ogden. In August, 1909, the Bear Creek Land Company was organized with a capital stock of 200,000 shares of the par value of one dollar each and acquired timber lands and mills in Oregon. The defendant, shortly thereafter, purchased 40,000 of 84,500 issued shares of that company and paid therefor $40,000. On December 31, 1908, the defendant declared and paid its first dividend of $8,979.75; on February 23, 1909, a stock dividend of $50,000; and on December 30th a cash dividend of $32,265, which was paid January 1, 1910; and between February and December paid additional cash dividends. The total dividends declared and paid for the year 1909 were about $110,000. In 1910 it paid a cash dividend of about $35,000, in 1911, $14,185, and in 1912, about $6,000, mostly on preferred stock. In May, 1912, the defendant's net assets, as shown by its books and as testified to by its president, were $219,213.40. This, however, is claimed to have been exaggerated by adding pretended increased cost prices of material and market values of real estate. Its total issued stock then was 265,633 shares; its capital stock having been increased in the meantime to 500,000 shares, of which 150,000 were preferred shares. Every stockholder was given the privilege of converting common stock for preferred stock. All the stock purchased by the plaintiffs was common stock.

Some of them, after their purchase, exchanged some common for preferred stock. The lumber yard at Ogden and the milling and lumber business in Oregon were operated at a loss.

It is alleged in the complaints, and admitted by the defendant, that on the 23d day of October, 1908, about two months after the defendant was organized, it authorized and empowered its president and secretary "to find purchasers for and negotiate the sale of and sell its treasury stock at the price and sum of one dollar per share." About that time the defendant put out a printed circular in which it stated:

"The directors of the company have set aside 50,000 shares of the capital stock of the company, amounting to $50,000, to provide for additional working capital. Said stock will be sold at par, and the directors assure the investing public that they will secure the stock at the same price as they have paid for their interests in the company. * * * If you desire to invest your money safely and at the same time get handsome returns from same, we would respectfully call your attention to the above opportunity. Remember that many of the greatest fortunes have been made along the lines we will follow out. Therefore you can readily see that you cannot possibly put your money in anything that will be so safe and at the same time productive of such handsome returns on your capital. The company will be able to pay dividends from the very start, and we can recommend the stock as a first-class investment that will improve as time advances. Our company is not experimenting on anything that has not been proven a success, and, if we can approximate the success that other similar companies have made in other cities, we are safe in saying that all our stockholders will be delighted with the returns from their investment. * * * We claim further that through having the combination of a large capital and experienced men handling same, and practically never owing one cent to any one, we can consistently guarantee to all investors that they cannot lose one cent and will receive dividends from the very start either payable quarterly or semi-annually in cash. Any excess over the cash dividend will be carried to surplus or distributed in stock dividends."

Copies were received by all of the plaintiffs before they

purchased any stock.  All of them testified that they, for a long time, had been well acquainted with the secretary and had the utmost confidence in him.  They were all railroad employees.  Formerly the secretary was also for a number of years in the employ of the same railroad company.  All of the plaintiffs were solicited by the secretary, some of them by both the president and the secretary, to purchase the defendant's treasury stock.

In the Campbell case the evidence with respect to additional statements and representations made to Campbell by the secretary and president, and as testified to by Campbell, is:  The secretary talked with him about purchasing stock several months before he purchased his first stock, which was 400 shares, February 6, 1909.  The secretary said to him:

"I consider you one of my best friends, and I would like you to get all you can as quick as possible."

He told him who the directors and officers of the defendant were, their business experiences and connections, and stated:

"We own our own real estate; own buildings all rented as fast as we can get them completed.  We own our own lumber yard and our own timber.  We are doing an elegant business, and all the money you can get I would advise you to put into this company.  It is worth a dollar a share, and we expect it to go to two dollars right away.  Why save your money in the bank at four per cent.?  We can guarantee eight.  *  * * I could guarantee it as a gilt-edge investment.  It is no speculation.  It is founded on a standard, reliable company. You can't lose one cent.  *  *  *  In from three to five years (if he purchased 5,000 shares) you will be independent, as everything is prosperous, and we are expecting to open up timber lands and sawmills in Oregon.  *  *  *  We guarantee eight per cent. for the next three years, and maybe more.  It may be twenty-eight per cent. the way business looks now."

He further testified that the secretary assured him that he was taking no chances whatever, and that he was buying into the best thing that ever was sold; that the stock was good, dollar for dollar, at any bank in Salt Lake, and he or the defendant would give him dollar for dollar for his stock.  After

the witness had purchased the first stock, he had a further talk with the secretary in which he told him that the defendant owned its own timber lands, its own sawmills, and was shipping its own lumber, and had a market not dependent upon the Salt Lake market. He also thereafter had a talk with the president. He told him that:

"It is the finest investment you ever got into. I want to make you working boys some money."

He told him that the company was financially in first-class circumstances, did not owe a dollar, and that it paid cash for everything it bought, and that it guaranteed eight per cent., and maybe more, and that "if you get 5,000 shares we guarantee that in five years you will be an independent man; that you won't have to work for a railroad company or any other company"; that the company was financially reliable and guaranteed dividends on all outstanding stock, and that there was no chance to lose a cent, and that the dividends would come regularly at eight per cent.; that the property was paying a good income; that the company had enough money coming from its property to guarantee the dividends it was paying; that the company had made the money that paid the dividends; and that they could be looked for regularly. He asked the witness if he had received the $100 dividend, the ten per cent. cash dividend (paid January 1, 1910), and stated that he could guarantee those dividends; that the company had made the money that paid the ten per cent. dividend, and that they could be looked for regularly; and that the money also had been earned that paid the stock dividend. The witness thereafter, on the 15th of January, 1910, purchased 1,400 additional shares, and on the 21st of March, 1910, 2,500 shares more. He, as well as all the other plaintiffs, paid a dollar a share for all stock purchased by them. He in 1909 was paid $50 in dividends; in 1910, $278.31, of which $100 was paid January 1, 1910; in 1911, $339.31. The court awarded him judgment for all the moneys paid by him, together with interest thereon, less the dividends received by him, with interest—a judgment of $4,767.50.

In the Rugg case the evidence with respect to additional statements and representations is: The secretary, after tell-

ing him who constituted the directors and officers of the company, stated:

"That they were ready to do business and would pay dividends right on the start, and that they guaranteed eight per cent. interest "on his money. * * * You can't miss it, Ben. It is the finest thing we have ever had a chance to get into. * * * We guarantee to pay you eight per cent. What is the use of leaving your money in the bank at four per cent. when we guarantee to pay eight per cent.? * * * We have all kinds of real estate in Salt Lake. You know the profit in lumber. * * * We have property and lumber in our yard that, if we don't do anything else or go into anything else, we can pay eight per cent. dividend from three to five years."

Rugg, on November 7, 1908, purchased 200 shares, and on the 27th of that month 1,000 shares, in June, 1909, 1,000 shares, and in November of that year 200 shares. The secretary thereafter urged him to buy more, and said:

"We have got an enormous thing. If I should tell you all that we have got, you could hardly believe me. * * * I would advise you to buy all the stock you can in our company. It is a sure and safe investment."

In the fall of 1909 he stated to him that they had timber lands and sawmills in Oregon, and that the profit from that land would pay the interest on the money that the stockholders had invested in the company. Later he called his attention to the "big dividend paid the first part of the year 1910," and asked him if he had received it. The witness replied that he had. The secretary stated:

"You will have them right along. * * * The company is all right. It is getting better all the time. We are not thoroughly started yet. We are going to open branches around the country. We don't want to let it get out. You get all the stock you can."

The witness, between January 15 and October 27, 1910, purchased 1,800 additional shares. The dividends paid him in 1909 were $167.80; in 1910, $443.33, of which $278 were paid January 1, 1910; in 1911, $121.31; and in 1912, $170.57. He was given judgment for $4,452.59.

Campbell v. Zion's Co-op. H. B. & R. E. Co. (8 other cases), 46 Utah 1.

In the Fred King case, the plaintiff testified that the secretary advised him to go into the company, and said it was a good thing, and wanted him to invest his money; that they had a good man at the head of the business, and that it was the best proposition that he ever would get into, and that they would pay right on the start eight per cent. dividends or more; that they would guarantee that much, and that they would pay eight per cent. dividends right along for the next three or five years; that they could do this because they had a good business and a couple of lumber yards, and that, if he purchased 5,000 shares, he would be independent for life; that, if he purchased stock and "got cramped" and wanted money, the company would buy it back at par; that it was worth a dollar a share and always would be worth that much or more. He further said:

"I tell you it is a big thing. After we get started we don't know where it will end. It is going to be one of the biggest companies in the state."

He further said that he was fixed so that he could pay dividends right on the start; would guarantee eight per cent. On the 23d day of October, 1908, the witness purchased 2,000 shares, and in the latter part of December of that year an additional 1,000 shares. He thereafter had a conversation also with the president, who told him that "we can guarantee eight per cent., and maybe more." He later had a further conversation with the secretary, in which he stated that they were going into the lumber business up north, and that it would be one of the biggest things in the country; that they would make lots of money out of timber lands; and that they could not use it all in 20 years. He asked the witness how he liked his dividends, and stated:

"You will get them right along. The company is earning money. You will get the dividends right along."

He again stated that they would guarantee eight per cent., and stated that they were making that on the lumber, house rents, and buying and selling real estate, and out of timber lands. In another conversation the witness' attention was again called to the dividends, and was asked: "What do you think of the big dividend?" The witness replied: "That is

all right." The secretary answered: "We earned them, and we are going to continue to earn them." The witness, in June, 1909, purchased 1,175 additional shares, and on the 1st of October, 1910, 4,000 shares more. The dividends paid him in 1909 were $366.50; in 1910, $864.72, of which $500 was paid January 1, 1910; in 1911, $213.06; and in 1912, $22.06. He was given judgment for $9,099.75.

George King, before he purchased stock, had a conversation with the secretary in which he told him they had lumber yards in Salt Lake City, real estate, were going to build houses, buy and sell real estate, and would pay dividends right on the start, and advised him "to get into it." He told him that if he got 5,000 shares he would be independently rich from the dividends that the company would pay and was able to pay. He told him that the business was an enormous thing, and that he wanted all of his friends to get into it. He stated that their assets were such that they could pay dividends right on the start, and that they would guarantee eight per cent., and that they were able to pay eight per cent. interest from three to five years without hurting the company's financial standing; that the resources and earnings from what they had would be eight per cent. from three to five years; and that at any time he got "cramped, bring your stock down and we will redeem it and give you dollar for dollar." The witness purchased 1,000 shares on the 30th of December, 1908.; in December, 1909, 725 shares; and in January, 1910, 1,000 shares. After his second purchase the secretary told him that the company had acquired timber lands in Oregon, had sawmills, and was shipping lumber. He called his attention to the dividends which had been paid. The witness asked him if the company could afford to pay the dividends, and if they could keep them up. The secretary replied:

"Well, if we didn't earn it we couldn't pay it. If it is doing it now, why won't it do it from then on? No reason in the world."

At another time the secretary asked him if he was satisfied with his dividends. The witness said that they were all right, and asked:

"Are you still going to keep on paying these big dividends?"

The secretary replied:

"You bet you. We have got the stuff right with us to pay it.* * * That the company was able to pay them from the earnings of the company."

The president told him the same thing. The dividends paid him in 1909 were $135.50; in 1910, $321.58, of which $200 was paid January 1, 1910; in 1911, $71.04. He was given judgment for $2,967.42.

Haslet purchased 2,000 shares on the 20th of January, 1910. He was solicited a number of times before he purchased his stock. Similar statements were made to him as were made to the other plaintiffs. Just before he purchased the stock, the secretary told him that he was sorry that he had stayed out so long, and called his attention to the dividends King and Campbell had received, and stated that they guaranteed eight per cent. dividends from three to five years and agreed to take back the stock at par at any time. In response to an inquiry of the "big dividend," the secretary answered: ·

"You needn't argue to me that we can't pay dividends like that because we did, and our earnings justified it, and we paid them without any detriment to the company. If we can do that, why can't we guarantee eight per cent.?"

He further stated that:

"The profits are something enormous. * * * It is the last chance you will ever get to buy any stock. You have kept out too long now. We have only got a little batch of treasury stock left for sale."

He further stated that the payment of these "big dividends in 1909 didn't impair the standing of the company whatever." He was given judgment for the $2,000, with interest, less the dividends received by him, $2,466.70.

Estes purchased 2,500 shares on the 18th of February, 1910. He also had similar conversations with the secretary and president as testified to by the other plaintiffs. In January, just before he purchased his stock, the secretary told him that he missed it "by not getting in; that he missed the big dividend that was paid January 1st; and that Fred King

got $500." The president told him that they had thirty-five houses in Salt Lake City, and a lumber yard, and that they were able to pay dividends on their stock from the property they owned in Salt Lake, and that they could guarantee eight per cent. He was given judgment for $2,837.87.

Breining, in August, 1908, had a conversation with the secretary in which he told him that the company would pay eight per cent.; that the stock would always be par, and that he always could get his money back, and that the purchase of 5,000 shares would make him independently rich; and that the company had "a certain amount of real estate," and would commence to pay dividends right away. In September, 1908, he purchased one hundred shares. He had a further conversation with the secretary in which the secretary asked him what he thought of the big dividend of February 23 (1909). He replied, "all right;" and asked, "How are you folks paying that?" The secretary answered:

"Why, that is nothing to what we will do. We haven't started yet. We must have earned it or we wouldn't be able to pay it."

In April, 1909, the witness purchased 173 additional shares and in May of that year 200 shares more. He was given judgment for $518.35.

Voll purchased 1,000 shares on the 15th of December, 1908. At several times he had conversations with both the secretary and the president before he purchased his stock. They told him:

"This is going to be a mighty good thing, Fred. You had better invest some money."

They called his attention to the fact that the company had fourteen houses, some under construction; that they would average in value probably $3,500 each, and would rent for thirty dollars to forty dollars each; and that the income from that would more than pay the dividends they expected to pay on the stock. About two weeks later they urged him to buy stock, and stated that they were going to pay a dividend early in January, 1909, and that, if he would invest, he could participate in the first dividend; that they would guarantee eight per cent., and probably more, and told him that if,

at any time, he felt dissatisfied with his stock, or needed any money, they would take it back at par; that the stock would increase in value; that it would double in value inside of a year or eighteen months, and that, if he purchased 5,000 shares, it would not be necessary for him to work any longer; that "he could sit around and take it easy," and that "this is the biggest thing I ever knew in my life." He also had a conversation with the president, and "he assured me that he thought it was a mighty fine proposition and a good thing to put a little money in, and advised me to buy 5,000 shares." The witness was given judgment for $1,014.49.

Haymond purchased 500 shares on the 27th of October, 1908. He testified that the secretary told him that:

"We have got considerable property in Salt Lake and got a lumber yard, and they are running good. We are doing a good business in the lumber yard, and we are selling stock at the rate of a dollar a share. I want to get some of you fellows that I know well in on this and make you a little money. * * * The first dividend will be paid the first of the year. Get right in now and get in on the first dividend. It is going to be a big thing. It is gilt-edge. * * * If you get 5,000 shares in this company, inside of a few years you will be independent. You won't have to work for these damn railroad companies any more."

The president told him of their lumber yards; that the business was flourishing; that he had been in the lumber business for twenty years and made lots of money; that they guaranteed eight per cent. dividends; on one occasion that "we have got an income now if we don't make another cent from three to five years we can guarantee we will pay eight per cent. on every dollar that you invest in this company"; and on another "that they had the property and could pay dividends," and that "we have got money enough now, if the company never earns another cent, from our lumber and real estate that we can guarantee you that we will pay you eight per cent. dividend." He told him that he was foolish to leave his money in the bank at four when he could get eight per cent., and that it would be a good business proposition to borrow money at seven per cent. to buy stock, and that at

any time he desired to sell his stock they would buy it back at par.  Haymond was given judgment for $514.69.

There is much of this which, standing by itself, would not be actionable.  The law applicable to the subject in hand is well settled and is well stated in *Southern* *Development Co.* v. *Silva,* 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678, as follows:

"In order to establish a charge of this character the complainant must show by clear and decisive proof:  First, that the defendant has made a representation in regard to a material fact; secondly, that such representation is false; thirdly, that such representation was not actually believed by the defendant, on reasonable grounds, to be true; fourthly, that it was made with intent that it should be acted on; fifthly, that it was acted on by complainant to his damage; and, sixthly, that in so acting on it the complainant was ignorant of its falsity, and reasonably believed it to be true.  The first of the foregoing requisites excludes such statements as consist merely in the expression of opinion or judgment, honestly entertained; and again (excepting in peculiar cases) it excludes statements by the owner and vendor of property in respect to its value."

Also in 14 A. & E. Ency. L. p. 34, and 20 Cyc. pp. 17, 20.

The statements that the defendant had a capital stock of 250,000 shares, of which 80,400 had been issued and were fully paid at par, that it had 50,000 shares in the treasury as treasury stock, that the directors and subscribers of the 80,400 shares had paid par value, the same price paid by the plaintiffs, and that the defendant had considerable real estate and two lumber yards in Salt Lake and was there doing a real estate and lumber business, were not shown to be false.  The books of the defendant showed, and its president testified, that its business at Salt Lake for 1908 and 1909 was profitable, but "fell off" in 1910, due to business depressions and to financial and market conditions beyond the defendant's control.  That the business, profits, and earnings, however, were such as to justify the dividends paid, and the statements made respecting them, is another thing which presently will be considered.  The statements that the lumber and milling business in Oregon was profitable are shown to be false.

The statements that investors will "get handsome returns," that their "investments will be safe," that "fortunes had been made in the same line," that "the stock was worth a dollar a share and would double in value," that purchasers "could not lose, took no chance," that if they "were dissatisfied with their stock the company would buy it back at par," and statements concerning the mere worth or value of the defendant's holdings or assets, future costs and expenses of operation, future profits to be derived from the business, or from the purchase of stocks, or other investments, the future ability of the defendant to pay dividends, and other similar expressions and statements, that "the purchase of 5,000 shares would make the purchaser independent for life, would not have to work any more," that "this is the biggest thing I ever knew in my life, the biggest in the state, the best thing ever sold, a mighty good thing," and other similar statements and expressions, are mere opinions, beliefs, future promises, assurances, or happenings, or "trade talk" and "puffings," and not, in themselves, actionable. *Swan* v. *Mathre*, 103 Iowa, 261, 72 N. W. 522; *Croker* v. *Manley*, 164 Ill. 282, 45 N. E. 577, 56 Am. St. Rep. 196; *Buena Vista Co.* v. *Billmeyer*, 48 W. Va. 382, 37 S. E. 583; *Riley* v. *Treanor* (Tex. Civ. App.) 25 S. W. 1054; *Milwaukee Brick & Cement Co.* v. *Schoknecht* 108 Wis. 457, 84 N. W. 838; *Mumford* v. *Tolman*, 157 Ill. 258, 41 N. E. 617; *Lynch* v. *Murphy*, 171 Mass. 307, 50 N. E. 623; *Meyers* v. *Alpena L. & B. Ass'n*, 117 Mich. 389, 75 N. W. 944; *Warner* v. *Benjamin*, 89 Wis. 290, 62 N. W. 179; *Getchel* v. *Dusenberry*, 145 Mich. 197, 108 N. W. 723; *Commonwealth* v. *Mechanics' Mutual Fire Ins. Co.*, 120 Mass. 495; *Kimber* v. *Young*, 137 Fed. 744, 70 C. C. A. 178; *Martin* v. *Eagle Creek Dev. Co.*, 41 Or. 448, 69 Pac. 216; *Weston* v. *Columbus Ry. Co.*, 90 Ga. 289, 15 S. E. 773.

As we view the case, about all the actionable statements are those relating to the defendant's ability, out of present holdings, property, moneys, or earnings, to pay dividends "from the very start," guaranteeing the purchasers that the defendant had present ability to pay dividends, not only in the future, but "from the very

start,'' and those that the dividends declared and paid were earned and justified, and that profits were derived from the defendant's lumber and milling business in Oregon. The defendant, in its circular, stated that:

''The company will be able to pay dividends from the very start. * * * We can consistently guarantee to all investors that they * * * will receive dividends from the very start, payable quarterly or semiannually in cash.''

Its president and secretary, expressly authorized to sell the stock, stated that the defendant guaranteed to pay eight per cent. for from three to five years; that it had property, assets, and money to justify the payment of such dividends without ''hurting the company's financial standing,'' and though ''the company never earns another cent''; and that the dividends which were declared and paid were earned and justified. These, among others, the court found were false and were mad in bad faith and to deceive. The defendant, in the year 1909, one year after its organization, declared and paid a stock dividend of $50,000, a cash dividend of about $60,000, $32,000 of which was paid at one time, a total dividend for that year of about $110,000, an excess of dividends over earnings for that year of about $64,000. In 1910 it paid a cash dividend of about $35,000, which also was in excess of the earnings for that year. We find nothing in the record to justify these dividends or the statements made concerning them. The defendant declaring and paying them held out to the ''investing public'' that they had been earned, were paid out of surplus profits or net earnings, and were justified. That was not true. But the president and secretary stated and gave assurances that they had been earned and were justified. In selling stock much was made of ''the big'' dividends. The plaintiffs testified that they believed the statements, and that they relied upon them. Most of the purchases were made after the large stock dividend of $50,000 had been declared and paid. Some of the plaintiffs mortgaged their homes to raise money with which to purchase stock. They further testified that they had no knowledge that the dividends had not been earned until shortly before these actions were commenced, when they had

16          SUPREME COURT OF UTAH.          [Dec.

Campbell v. Zion's Co-op. H. B. & R. E. Co. (8 other cases), 46 Utah 1.

the defendant's books inspected and examined by an expert accountant. Declaring and paying dividends, not out of surplus profits or net earnings, is an act which in and of itself is fraudulent, fraught with false representations, and calculated to deceive. Such representations, and the statements made by the defendant's president and secretary that the dividends had been earned and were justified, relate to material and existing or past facts. That all of the plaintiffs who thereafter purchased stock were influenced and deceived by such representations and statements cannot, on the record, be doubted. The court found that the defendant and its president and secretary, in such particular, acted in bad faith and with knowledge that the dividends had not been earned. We think the findings as to that are justified, and that all of the plaintiffs who purchased stock after the first large dividend of $50,000 was declared and paid are clearly entitled to recover.

Now, as to those who purchased stock prior thereto. The court found that the assets and earnings of the defendant were not such, at any time, as to justify the payment of dividends, at least not to the extent declared and paid. The dividends paid from August, 1908, when the defendant was organized, to December of that year, were about $9,000. There is evidence to show that they were about $3,000 in excess of surplus profits. To the contrary there is evidence to show that the net earnings of the defendant for that year, including about $2,700 gain price of merchandise, were about that large. It, however, does not follow from that, nor does the record otherwise disclose, that the defendant, for that reason, was justified in paying them out as dividends. But the most important statements to these plaintiffs are those that the defendant had on hand sufficient money, property, or assets with which to pay eight per cent. dividends from the start, and from three to five years, without "hurting the financial standing of the company," and though "it did not earn another cent," and those guaranteeing a present ability to pay dividends. These, the court found, were also false, and that they were made in bad faith. The finding is assailed because the plaintiffs, as is asserted,

in fact received dividends to an amount equivalent to an eight per cent. dividend for from three to five years. There is nothing to that, because they were not entitled to them, not having been earned and not paid out of surplus profits or net earnings. On the record, we do not find anything to justify even the statements made to the plaintiffs purchasing stock prior to the "big dividends." Some of them, in a sense, may be said to be statements or expressions of opinions or beliefs. Generally speaking, it may be conceded, and we do not depart from it, that statements or expressions concerning a mere worth or value of the defendant's holdings or assets, future costs and expenses of operation, profits to be derived from the business, or purchase of stocks, or other investments, that the defendant in the future will be able to pay dividends, that stockholders or other investors will derive great, or any, profits, and other similar expressions or mere opinions or beliefs, are not, in themselves, actionable. But the effect of the statements here is that the defendant then had property, assets, and moneys with which to pay dividends "from the very start," and to continue to pay them, for from three to five years, without impairing the financial ability of the company, and regardless of future earnings or other sources of income. That was not true nor justified. These, if they are not statements of material and existing facts, certainly come within the rule of actionable false statements of opinions, if, as found by the court, they were made in bad faith and to one entitled to rely upon them, and, as stated by Mr. Justice Henshaw, in the case of *Phelps* v. *Grady*, (Cal.) 141 Pac. 926:

"True, of course, it is that expressions of opinion honestly made are not actionable. Equity has no concern with them. But equally true it is that a false statement of an opinion or a false opinion expressed to one entitled to rely upon it may form the basis of an action for deceit, like any other misrepresentation of fact"—citing cases.

The court found there was nothing to justify them; that they were false; that they were made in bad faith, and to in-

Campbell v. Zion's Co-op. H. B. & R. E. Co. (8 other cases), 46 Utah 1.

fluence, mislead, and deceive the plaintiffs; that they had the right to rely, and did rely, upon them, and, because of them, were deceived and induced to purchase stock and were injured. The court, upon the evidence, further deduced the conclusion that the statements made to those who purchased stock in 1908, and the action of the defendant paying and declaring dividends grossly in excess of surplus profits, and the statements made by its president and secretary with respect to them, were but parts of a fraudulent transaction or scheme to create a false market for, and a false value of, the defendant's capital stock. It is unnecessary to the decision to go to that extent. It is enough to hold, as we do, that there is sufficient evidence to show that the statements were not justified; that they, as found by the court, were not honestly made, nor true; that they came from those who presumably had and claimed to have personal knowledge of the facts declared; that those to whom they were made were entitled to rely, and did rely, upon them; and that they were influenced, deceived, and injured by them. As to whether the statements were made dishonestly, or in bad faith, or with an intent to deceive, is, on the record, open to controversy. As to that, the evidence is in conflict. Much can be said in support of either theory. So, is there a conflict in the evidence as to whether some of the statements testified to by the plaintiffs were made or not? Some of them testified to as having been made by the president are denied by him. Those testified to as having been made by the secretary are not denied. What the ultimate facts in this respect may be is largely dependent upon the credibility of the witnesses, the weight to be given their testimony, and motives of the parties. The trial court, with the witnesses before him, had better means and opportunity than we have to get at the real truth. So, adopting the findings, we, on the record, think they and the conclusions in the particulars indicated are supported by good and sufficient evidence, and that hence the judgments should be affirmed; the plaintiffs, and each of them, as tendered by them, and as decreed by the court, to surrender the certificates of stock so purchased by them on payment or satisfaction of the respective judgments.

Appeal from Second District.

Such is the order. Let it be made in each case. Costs to the respondents.

McCARTY, C. J., and FRICK, J., concur.