FRANK KRANKOWSKI *et al.* Plaintiffs in Error, *vs.* W. A. KNAPP *et al.* Defendants in Error.

*Opinion filed April 22, 1915—Rehearing denied June 11, 1915..*

1. FRAUD—*what necessary to constitute such misrepresentation as justifies rescinding contract.* A misrepresentation, to constitute fraud sufficient to authorize rescission of a contract in equity, must be a false statement of a material fact, known or believed by the party making it to be untrue and made by him for the purpose of inducing action by the other party, who believes the representation to be true and relies upon it to his injury.

2. SAME—*fraudulent representation may sometimes be in reference to a matter of opinion.* Where a party states a matter not as an expression of opinion but as an affirmation of a fact material to the transaction, so that the other party may reasonably treat it as a fact and rely and act upon it as such, then the statement becomes an affirmation of fact, and may be a fraudulent representation even though the statement might otherwise be only an opinion.

3. SAME—*what is not such a representation of value as constitutes fraud.* A representation by the proposed vendors of land to the proposed purchaser, who has seen the land, that in their opinion the land is worth $25 per acre, is not such a representation as constitutes fraud, particularly where the weight of the evidence shows that the land is worth approximately that amount.

WRIT OF ERROR to the Circuit Court of LaSalle county; the Hon. EDGAR ELDREDGE, Judge, presiding.

W. A. PANNECK, for plaintiffs in error.

H. M. KELLY, for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed by plaintiffs in error against de-
fendants in error to set aside a certain deed executed by
them to the defendant in error W. A. Knapp. After the
pleadings were settled the matter was referred to a master
in chancery to take evidence, and he reported recommend-
ing the dismissal of the bill for want of equity. On a
hearing the trial court overruled the exceptions to this re-
port and entered a decree in accordance with the master's
recommendations. From that decree this writ of error has
been sued out.

The plaintiff in error Frank Krankowski has lived for
years with his wife and family in the city of LaSalle, in
the county of that name, in this State. He owned a house
and lot, where he had resided for a long period. At the
time of the transaction here in question, in November,
1911, he was about sixty-five years of age, his family con-
sisting of himself and wife and a number of children. One
of the daughters, who was married when the trade here in
question was made, resided in LaSalle, near her parents.
Three sons, respectively nineteen, twenty-three and twenty-
six years of age, and two unmarried daughters, respectively
sixteen and twenty years of age, lived with their parents.
Two of the sons worked as coal miners and the other for
a cement concern. Krankowski was raised in Europe on
a farm but had resided in this country for many years,
working at first in a coal mine and during recent years
working a part of the time in a brewery and a part of
the time keeping cows and selling milk. The defendant in
error W. A. Knapp has been engaged in the real estate
business in Warren, Marshall county, Minnesota, for a
number of years. He was one of the officers and prin-
cipal owner of the Pioneer Loan and Land Company, a
Minnesota corporation, having for its chief business the

purchase and sale of lands in that State. Some time in October, 1911, Anton Honeke, who was acting as the agent of said land company and who resided at Spring Valley, about five miles from LaSalle, came to Krankowski's home to talk with him about buying Minnesota lands. Honeke visited the Krankowski family several times that month and the wife and some of the children were present at these visits. Krankowski himself can talk and understand English fairly well, but apparently his wife can talk and understand very little, if any, of that language. The children, being raised in this country, seemed to understand English well. Krankowski was interested in the question of buying a farm for himself and family, but when it was suggested that he go to look at the Minnesota lands said that he did not have the money to pay his fare. Honeke told him that he would pay his fare and expenses out there and back, but if he did not buy any land he (Krankowski) must re-pay the expenses of the trip. With this understanding, on November 2, 1911, Krankowski and Honeke left LaSalle for Warren, Minnesota. On the train out they met Knapp, who was taking another party to the same locality. Upon their arrival in Warren, Minnesota, Honeke took Krankowski in an automobile to visit three different farms. It was one of these farms that Krankowski afterward contracted for. We judge that the second day they visited other farms. After they had visited the first farms Honeke and Krankowski returned to Warren, and that evening Krankowski talked with Knapp about purchasing the farm, stating that he thought the land too high-priced. Both he and Knapp agree that Knapp thereupon told him if he didn't want to buy at that price he better go back home. No attempt was made to make a trade while Krankowski was in Minnesota. A short time after the return to LaSalle, Honeke came around to talk with him again about the farm. As the result of this talk Honeke requested Knapp to come to

LaSalle, (Knapp's headquarters in this State were, apparently, at Joliet,) and upon Knapp's arrival they went to Krankowski's house, and a contract was made November 10, 1911, for a trade of the house and lot belonging to Krankowski in LaSalle, at a valuation of $3200, for one of the three farms that Krankowski had seen the first day of his visit to Minnesota, at $4000, being $25 an acre, Krankowski to pay the difference between the $3200 and the price of the farm ($800) in cash. This contract was signed by Knapp and Krankowski and his wife. A few days later Knapp found that the land he had agreed to sell contained only 95 acres instead of 160 acres, and he went back to LaSalle and told Krankowski about the mistake, suggesting that he take one of the other farms he had seen the first day, which contained 160 acres. The first contract was destroyed and another one drawn, dated November 17, 1911, for 160 acres of land at the same price, ($4000,) the house and lot to be turned in at $3200. While this contract or memorandum of sale states that Krankowski was to pay the difference of $800 in cash, it also contained a statement that under certain conditions Krankowski was to assume a mortgage then on said farm for $800, due January 25, 1917, with interest. On November 27, 1911, Knapp and Honeke came again to the home of Krankowski with a deed for the Minnesota land, signed and executed by Knapp, conveying said land, subject to a mortgage of $1600, to Krankowski, the deed further stating, however, that $800 had been paid upon said mortgage and that the balance of $800 was assumed and agreed to be paid by the grantee. A deed was also prepared, under the direction of Knapp, to convey the house and lot in the city of LaSalle to himself. He made arrangements with attorney S. P. Hall, of LaSalle, who was also a notary public, to take the acknowledgment of Krankowski and wife to this deed. Hall went with Knapp and Honeke to Krankowski's home, and after some con-

versation among the parties, the twenty-year-old daughter being present a part of the time, the deed to the house and lot in LaSalle was executed by Krankowski and his wife and acknowledged before said Hall. Hall testified that he asked Krankowski if he understood what he was doing and was answered in the affirmative. Hall also testified that from the conversation he understood that Krankowski was to assume an $800 mortgage on the farm in Minnesota. The testimony of Hall, Knapp and Honeke was all to the effect that Krankowski understood fully the nature of the transaction he was entering into at the time he signed the deed, and that he requested Knapp to have the deed running to him, (Krankowski,) as grantee of the Minnesota land, recorded in Minnesota, and agreed to pay the cost of recording, although no money was passed at the time, and that Knapp took the deed and had it recorded. The parties at the time exchanged abstracts for the different places. The house and lot in LaSalle were free and clear of all encumbrances, while the abstract for the Minnesota land showed a mortgage for $1600. The evidence shows, however, that Knapp had already paid $800 on said $1600 mortgage and only $800 remained due thereon. Krankowski testified that he did not understand the nature of the transaction he was entering into at the time these deeds were transferred; that he supposed the title to the property of the Minnesota farm was free and clear of all encumbrances. It is manifest, however, from the testimony of the twenty-year-old daughter who was present at the time both contracts were entered into, the one November 10 and the other November 17, that she fully understood her father was to pay $800 over and above the $3200 at which the house and lot were valued in the trade for the farm. The only possible chance for misunderstanding was as to whether this $800 was to be paid in cash or whether Krankowski was to assume a mortgage for the amount. It seems quite apparent from

what appears in the record that Krankowski was not then prepared to pay $800 in cash.

Several witnesses testified for both sides as to the nature and character of the farm in Minnesota and its value. As in most cases of this kind, the testimony as to value was sharply conflicting. Several of the witnesses for the plaintiffs in error had never seen the farm in question, but testified they were familiar, in a general way, with farm lands in Marshall county, Minnesota, and the adjoining counties. One or two of the witnesses for plaintiffs in error owned property within a few miles of that here in question, but their evidence is not clear as to whether they had ever been on this specific quarter section. The evidence of all plaintiffs in error's witnesses is to the effect that the land in that vicinity was not worth more than $10 an acre. It figured in the trade at $25 an acre. One of these witnesses, however, who owned land within five or six miles of this land, stated that he had paid $29 an acre for his farm. The witnesses for plaintiffs in error who claimed to be familiar with the land said there were not over 15 or 20 acres in cultivation on the whole quarter section, and that much of the land was of such character that it could never be cultivated or crops raised on it, some being too wet, with no facilities for draining, and some too gravelly and sandy; that across this quarter section ran a ridge of high land practically incapable of cultivation, which had been known for many years as the Pembina trail, being used as the main road, in the early history of that country, for traveling across that section of the State. The witnesses for defendants in error testified that this land was well worth $25 an acre; that the ridge known as the Pembina trail did not cross this quarter section but came near it; that there were about 60 acres of this land under cultivation and all of it was tillable; that any that was wet at the present time could be drained and put in cultivation. Some of these witnesses

were not very familiar with the lands in the locality of this farm.

Counsel for plaintiffs in error contends that it does not clearly appear from the evidence that this farm was ever shown to Krankowski. The weight of the testimony, in our judgment, shows that in this he is mistaken. Honeke's testimony, while not in entire harmony upon some points, is obviously to the effect that this is one of the three farms shown on the first day.

The evidence shows, without contradiction, that on this farm there were a house and barn and some buildings. We think the weight of the evidence also shows that most, if not all, of the quarter section could be made tillable land. The weight of the evidence, in our judgment, also supports the conclusion of the master that the quarter section was worth approximately $4000.

The bill charges fraud and misrepresentation against defendants in error. Nothing is found in this record to justify this conclusion. It is true that Krankowski was an uneducated man, but it is manifest that no secret was made by Honeke or Knapp, at any time before the conclusion of the trade, as to what they were trying to do. Krankowski took the trip to Minnesota for the avowed purpose of trading for a farm. He was persuaded to make this trade, doubtless, because Honeke and Knapp argued with him it would be a good thing, with his family of grown-up children at home, if they could live on a farm. The children all testified that they never encouraged the trade and never wanted to move onto a farm, and that the father and mother both said they did not want to go unless the children did. These children all admit, however, that they understood that the father was talking about the trade and knew that he intended to make it. Some of the children were in the house and the twenty-year-old girl was present at the time the contracts were executed, and some of them were also in the house at the time the deeds were

signed and the transfer made. Knapp testified that he sug-
gested to Krankowski that he have the title examined be-
fore the trade was closed. Plaintiffs in error deny this.
The abstract of the Minnesota farm was left with plain-
tiffs in error after the exchange of deeds, November 27,
1911. The next day one of the daughters, in looking it
over, discovered that it showed that there was a $1600
mortgage on the place. This worried her. She talked
with her parents about it, and the abstract was taken to
an attorney and under his advice these proceedings were
instituted to set aside the deed to the house and lot. The
plaintiffs in error offered, at the time of the trial, to re-
convey the Minnesota farm to defendant in error Knapp.

Counsel for plaintiffs in error does not state any spe-
cific misrepresentations as to the character of the lands
that were made by defendants in error to his clients, but
does insist, as we understand the argument, that they mis-
represented the value of the land. A misrepresentation, to
constitute fraud to authorize equity to rescind a contract
on account of such misrepresentation, must contain the fol-
lowing elements: (1) Its form must be a statement of
fact; (2) it must be made for the purpose of influencing
the other party to act; (3) it must be untrue; (4) the
party making the statement must know or believe it to be
untrue; (5) the person to whom it is made must believe
and rely on the statement; (6) the statement must be ma-
terial. (2 Pomeroy's Eq. Jur.—3d ed.—sec. 876; *Pren-
tice* v. *Crane,* 234 Ill. 302.) We find no misrepresenta-
tions in the record that could be said to constitute fraud
as just defined. The most that can be said from this rec-
ord is that Honeke and Knapp told Krankowski that the
quarter section was, in their opinion, worth $25 an acre.
It is sometimes said that a fraudulent misrepresentation
cannot be made of a matter of opinion. This is not strictly
true. Whenever a party states a matter which otherwise
might be only an opinion, and does not state it as a mere

expression of his own opinion but affirms it as an existing fact material to the transaction, so that the other party may reasonably treat it as a fact and rely and act upon it as such, then the statement clearly becomes an affirmation of fact and may be a fraudulent representation. (2 Pomeroy's Eq. Jur.—3d ed.—sec. 878; *Crocker* v. *Manley,* 164 Ill. 282, and cases cited.) No such statement of opinion is found herein. Furthermore, as already stated, the weight of the evidence tends to show that the land in question was worth approximately what it was stated to be worth by defendants in error at the time the trade was made.

Counsel for plaintiffs in error contends that the fact that the contract of sale stated that the land in question was owned by the Pioneer Loan and Land Company of Minnesota while the deed for the quarter section was made by W. A. Knapp tends to show fraud. There is nothing in this record to indicate that Krankowski was misled in any way by this fact. As already stated, Knapp was the principal officer and chief owner of the Pioneer Loan and Land Company. He signed the contract of sale for such land company, and testified that as the quarter section stood in his name he did not deem it necessary to transfer it to the company and then from the company to Krankowski in closing up the sale. We cannot see how plaintiffs in error were injured in any way because Knapp, instead of the land company, conveyed the property to them. In some cases there might be a question as to whether the warranty of the one who conveyed would have as much back of it as that of the one designated in the contract as the prospective grantor, but no such question appears here.

The decree of the circuit court must be affirmed.

*Decree affirmed.*