Leo Michuda and Leo Michuda, Jr., Copartners Trading as Leo Michuda & Son, Appellants, v. Sanitary District of Chicago, Appellee.

Gen. No. 40,925.

Heard in the third division of this court for the first district at the October term, 1939. Opinion filed May 22, 1940.

LITSINGER, HEALY, REID & BYE, for appellants.

ERNST BUEHLER, FRANCIS X. BUSCH, JAMES J. MAGNER and RICHARD A. BECK, all of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

On July 18, 1935, defendant advertised for bids for the construction of an intercepting sewer, known as "Southwest Side Intercepting Sewer, Contract No. 4," and gave prospective contractors until 12:30 p. m. central standard time, on August 8, 1935, to submit sealed proposals, at which time the proposals were to be opened. The work, for which tenders were invited, consisted of building approximately 7,420 lineal feet of concrete sewer of an internal width of 14 feet 8⅜ inches, and an internal height of 16 feet 4 inches, in earth and rock, a river crossing, and miscellaneous work collateral thereto. The southwest side intercepting sewer was part of a sewer system which extended from the Sanitary District property located on South Crawford avenue in the city of Chicago, near the sanitary and ship canal, in an approximately due-easterly direction along West 38th street and along Pershing road (old 39th street), respectively, in Chicago, to approximately South Racine avenue, 38th street extended, and the south fork of the south branch of the Chicago river. Southwest side intercepting sewer No. 4 began at a point on South Western boulevard, a little north of 38th street, progressed in a southeasterly direction

through McKinley Park, until it reached South Damen avenue and Pershing road, then extended in a due-easterly direction along the southern south half of Pershing road to South Ashland avenue, passed under the western arm of the south fork of the south branch of the Chicago River, and then continued eastward until it reached its terminus near Racine avenue. The invitation to the contractors stated that the work upon which bids were invited included excavation, lining and bracing, disposal of water, furnishing and placing concrete, reinforcement steel and iron castings, back-filling, disposal of excess material, and incidental work. It stated that bids must be made upon blank forms of proposal furnished by the District, that they should conform to the terms and conditions set forth in the "Requirements for Bidding and Instructions to Bidders," and further advised bidders that the work was to be done under the supervision of the Federal Emergency Administration of Public Works. The "Invitation for Bids," the "Requirements for Bidding and Instructions to Bidders," were an integral part of, and preceded, the bidders' proposal and the contract between the contractor and the District prepared and bound in book form, with plans for the proposed work attached. The section of the booklet containing the "Requirements for Bidding and Instructions to Bidders" contained this paragraph:

"Bidders must carefully examine the entire site of the work and the adjacent premises, and the various means of approach to the site and shall make all necessary investigations to inform themselves thoroughly as to the facilities for delivering, placing, and operating the necessary plant, and for delivering and handling material at the site, and to inform themselves thoroughly as to all the difficulties involved in the completion of all work under the attached contract in accordance with the specifications and the plans hereto attached. Bidders are also required to examine all

maps, plans, and data mentioned in the specifications, contract or proposal as being on file in the office of the Chief Engineer, for examination by bidders. No plea of ignorance of conditions that exist or that may hereafter exist, or of conditions or difficulties that may be encountered in the execution of the work under this contract, as result of failure to make the necessary examinations and investigations, will be accepted as an excuse for any failure or omission on the part of the Contractor to fulfill in every detail all of the requirements of said contract, specifications and plans, or will be accepted as a basis for any claims whatsoever for extra compensation, or for an extension of time.'' Further paragraphs of the ''Requirements for Bidding and Instructions to Bidders'' directed the bidders to examine and inform themselves as to the covenants and conditions prescribed in the various ordinances, permits and licenses mentioned in the contract; to inform themselves with respect to the Public Works Administration requirements in specified articles of the contract, and then carried the following paragraph:

''Bidders must determine for themselves the quantities of work required and the conditions under which the work will be performed, by such means as they may prefer, and shall assume all risks as to variations in the quantities of the different classes of work. Bidders shall not at any time after the submission of this proposal, dispute or complain of the schedule of quantities or assert that there was any misunderstanding as to the amount or character of the work to be done, and shall not make any claims for damages, or for loss of profits or for an extension of time because of a difference between the approximate quantities of the various classes of work stated, and the quantities of work actually performed.''

Leo Michuda and Leo Michuda, Jr., father and son, were contractors in Chicago, doing business under the name of Leo Michuda & Son. Shortly after the adver-

tisement for bids appeared, Leo Michuda, Jr., learned of the proposed letting of the contract by reading the advertisement in a newspaper. He went to the office of the Sanitary District and obtained a copy of the booklet entitled, "Proposal, Specifications, Contract, Bond and Plans for the Southwest Side Intercepting Sewer Contract No. 4." The booklet contained: (1) the invitation to contractors for bids; (2) the "Requirements for Bidding and Instructions to Bidders"; (3) the "Proposal," submitted by the contractor, specifying the unit prices submitted by the bidder; and (4) the "Contract and Specifications," with appendices, and, last, nine sheets of detailed plans and profiles. The "Proposal" recited:

"The undersigned have also examined the foregoing 'Requirements for Bidding and Instructions to Bidders,' and have made the examinations and investigations therein required, and propose to do the work called for in said specifications and contract," etc. The proposal also contained the following:

"It is further agreed that the quantities indicated on the 'Forms of Proposal' are only approximate and are assumed Solely for the comparison of proposals and are not guaranteed to be accurate statements or estimates of the quantities of the different classes of work that are to be performed under the contract, and if awarded a contract for the work specified, the undersigned will not make any claim for damages or for loss of profits . . . because of a difference between the quantities of the various classes of work assumed for comparison of bids and the quantities of work actually performed." The contract was divided into three principal divisions: (a) General Specifications; (b) Detail Specifications; (c) General Conditions to the contract, followed by copies of the contractor's required labor bond, and appendices. The "work to be performed" is described in the contract, and in the "Invitation for Bids," as the construction of a "concrete sewer . . . in

tunnel in earth and rock." The paragraph of the contract captioned "Definitions," states that the work shall include "all material, labor, tools, and all appliances and appurtenances necessary to complete everything specified or implied in the contract or shown on the plans and specifications," and defined "site" as "the location hereinbefore described where the work under this contract is to be performed." Paragraph 6 of the "General Specifications" reads:

"The Contractor is required to examine the site of the work and adjacent premises, and the various means of approach to the site, and to make all necessary investigations in order to inform himself thoroughly as to the character and magnitude of all work involved in the complete execution of this contract; also as to . . . the conditions and the difficulties that will be encountered in the performance of the work specified herein. No plea of ignorance of conditions that exist or that may hereafter exist, or of difficulties that will be encountered in the execution of the work hereunder, as a result of failure to make necessary examinations and investigations, will be accepted as a sufficient excuse for any failure or omission on the part of the Contractor to fulfill in every detail all the requirements of this contract, or will be accepted as a basis for any claim whatsoever for extra compensation or for an extension of time." Section 13 of the "General Specifications" read:

"Profiles of the ground are shown on the plans hereto attached, which are believed to be reasonably correct, but are not guaranteed to be absolutely so, and together with any schedule of quantities, are presented only as an approximation. On file in the office of the Engineer is certain data relating to soil conditions to be encountered along the route of the work. While this information is believed to be accurate, the Sanitary District does not guarantee the same. The Contractor must satisfy himself by making borings or test pits,

or by such other methods as he may prefer as to the character, location and amounts of water, peat, clay, sand, quicksand, gravel, glacial drift, boulders, conglomerate, rock and other material to be encountered and work to be performed." Section 28 of the contract stated that the cost of performing all the work specified in sections 1 to 27 of the contract should be included in the unit or lump sum prices therein specified. In section 30 of the "General Specifications," under the heading "Earth Excavation. Tunnel," the contract reads:

"Earth excavation in tunnel shall include the loosening, loading, removing and disposing in the specified manner of all materials, wet or dry, necessary to be removed for purposes of construction, the furnishing, placing and maintaining of all sheeting, bracing and lining, the pumping, bailing and cleaning . . . and all incidental and collateral work necessary to complete the entire work as specified." Section 33 of the "General Specifications" under the heading "Excavation," prescribes how work is to be done if "bad soil conditions" are encountered, and if "due to unforseen conditions or otherwise, any movement of the earth over or adjacent to the work occurs." In section 34 of the "General Specifications," under the heading "Sheeting, Bracing and Lining," the contract provided for additional bracing when ordered by the engineer as necessary to support any material or structure in or adjacent to any excavation, so as to insure the safety of life and property. In section 46 of the "General Specifications," under the heading "Rock Excavation," the contract reads:

"Soil data on file in the office of the Engineer indicates that rock will be encountered. All rock excavation shall be performed by the Contractor in accordance with the following specifications, supplemented by the specifications for earth excavation. Sections 30 to 45,

inclusive, as far as they apply.'' In the first section of the portion of the contract devoted to the ''Detail Specifications,'' the contract reads:

''Under Item 1 the Contractor shall construct in tunnel in earth and rock a concrete sewer 14 feet 8⅜ inches internal width and 16 feet 4 inches internal height as shown on the contract plans.

''The sewer specified shall be constructed to the lines, grades and dimensions shown on the accompanying plans. Included in this work of construction is earth and rock excavation, both wet and dry, disposal of material, backfilling, sheeting, form work, shoring and bracing, pumping and removal of water, furnishing and placing of concrete, reinforcement steel, grout and all other incidental work necessary to the construction of the sewer complete as specified, all of which various classes of work shall be performed as hereinbefore specified. The grade of concrete shall be of the quality hereinbefore specified as Class A unless otherwise specifically stated.

''The work under Item 1 includes all excavation whether of earth or rock, wet or dry, and no additional payment will be made for any class of material encountered.'' In item 7.1 of the ''Detail Specifications'' provision was made for authorized additional rock excavation, when ordered as an extra to the contract. It reads:

''Under Item 7, the Contractor shall perform all authorized additional rock excavation. Included in this work is drilling, loading, blasting, excavating, trimming to the outline of the section, removal of material and all other incidental work necessary to fully complete the rock excavation, as specified, all of which various classes of work shall be performed as hereinbefore specified.

''Rock excavation performed under Items 1 to 4, inclusive, will not be paid for under Item 7.'' There are

numerous other references to "rock" in the detail specifications and to the removal and disposal of material, "wet or dry."

On Monday, July 20, 1935, Michuda, Jr. went to the office of the District and asked Mr. Otis, its designing engineer, to show him the soil information referred to in the specifications. He gave Michuda, Jr., a blueprint. The latter examined it at that time. Otis opened it and explained that the proposed sewer was a tunnel that would run from 38th street and Western avenue to 39th street near Racine avenue. Otis also explained that the test pits shown on that blueprint as numbers 23, 24, 25, 26 and 30, and the test pits on the east end of the sewer had reference to this particular contract, and the two of them together went through the soil information as shown. Michuda Jr. remarked that all of the test pits with reference to this contract looked uniform, and Otis said they did. Michuda Jr. spent about three hours there, examining the blueprint. The information contained on the blueprint was all the subsoil information obtained by the plaintiffs. On the plans and profiles which were attached to the contract are horizontal lines numbered 250, 251, etc., to 326 plus 23, at the end of the sewer. These numerals indicate stations, and are shown by the District for convenience. The stations are 100 feet apart. The distance between two stations is indicated by a plus sign, thus, station 251 is 100 feet east of station 250. If a location between the two is desired, it is designated by the station number plus the number of feet east of it, so 250 plus 26 would mean 26 feet east of station 250. Test pit 23 is located in McKinley Park at approximately station 259 plus 70. That it passes squarely down in the line of the tunnel, is indicated on the soil information chart, and on sheet No. 1 of the plans and profiles attached to the contract. Test pit 26 is located at approximately station 304 plus 90. This likewise passes directly down in the line of the tunnel as indicated on the soil informa-

tion chart and on sheet No. 3 of the plans and profiles. Pit 26 is located at Pershing road and Ashland avenue. Pit 25 is midway between pits 23 and 26. This pit (25) is at Winchester avenue, just north of the line of the tunnel, the exact location being 30 feet north of the north curb of Pershing road and 6 feet west of the west curb of Winchester avenue. It was 66 feet 6 inches north of the center line of the tunnel. Pit 30 is just east of the east end of the tunnel and directly in line. This differed from pits 23, 25 and 26 in that it was merely a boring, while the others were pits. Pits 24, 27, 28, 29, 31 and 32 were scattered in various places away from the line of the tunnel. The depth of the lower line of the tunnel below the surface of the street depended on the top surface, but generally speaking, it was about 46 feet below the surface. The tunnel was to be 16 feet 4 inches internal height and 14 feet 8⅜ inches internal width. In order to have sufficient space in which to work, place concrete, etc., it was necessary to excavate about 2 feet below and 2 feet above the internal dimensions. Thus the bottom of the excavation would be about 46 feet below the surface and the top of the excavation would be about 26 feet below the surface, so that the strata through which the excavation was to be made lay from 26 feet below the surface to 46 feet below. The blueprint which the Michudas call the soil information chart, contained a legend in large type reading: ''This information is believed to be accurate but the Sanitary District of Chicago does not guarantee it.'' Michuda Jr. went back to his office and went over the specifications and plans and acquainted himself with the information and conditions contained in the proposal, contract, plans and specifications. He read over everything in the documents very carefully before he made estimates and prepared bids. He was not unfamiliar with the provisions of the contract because he had examined a similar form of proposal and contract twice before, once in connection with a bid for a section

of the sewer known as contract No. 1, and again in connection with the proposed letting of a section of the sewer known as contract No. 3, which was immediately to the west of contract No. 4, on which he was bidding. Contract No. 3 was let to the S. A. Healy Company as the lowest bidder. After reading the contract, Michuda Jr. and his father went to the site of the work and made an examination of the surface of the territory through which the tunnel was to be constructed. The Michudas went out to the site two or three times. They made an inspection of the surface of the ground along the line through which the tunnel was to be constructed, and the buildings adjacent to the line of the tunnel. At the time they made their examination of the surface of the ground on Pershing road, work on contract No. 3 (immediately to the west) was going on, but they did not go down into that sewer or make any inquiries of persons familiar with the facts as to what kind of soil had been discovered in that portion of the sewer. They did not know where the shaft for contract No. 3 was located, nor did they make any effort to locate it. At the time they examined the surface of the ground along the line on which the tunnel was to be constructed, they had in mind the provisions of the proposal and of the proposed contract. They did not dig into the ground or make any test pits or test borings before submitting their bid. A test pit may be of varying diameters, but is dug by hand or air spades or other tools, depending upon the consistency of the ground. A boring is made with a ground auger. It is worked the same as a drill. It was the judgment of Michuda Jr. that in digging a test pit and working three shifts of four or five laborers, it would take two or three days to sink a test pit three feet in diameter to a depth of 50 feet, and with more men working he could dig several of such pits in that time. He was also of the opinion that it would take about eight hours to put in a boring to a depth of 50 feet. He stated that there was plenty of time to

make borings along the line of the tunnel between July 18, 1935, and August 8, 1935. On August 8, 1935, the Michudas submitted their bid in accordance with the forms provided by the District. Their bid was as follows: Item 1. For the sewer, 14 feet 8⅜ inches internal width, as specified, $128.95 per lineal foot; Item 2. For the river crossing, complete, in place, the lump sum of $72,947; Item 3. For standard manhole, complete, in place, $20 per lineal foot; Item 4. For the offset manhole bases, complete, in place, $250 each; Item 5. For reinforcement steel, complete, in place, $.035 per pound; Item 6. For iron castings and miscellaneous metals, complete, in place, $.10 per pound; Item 7. For additional rock excavation, $5 per cubic yard; Item 8. For additional earth excavation in tunnel, $4 per cubic yard; Item 9. For additional earth excavation in open cut, $1.50 per cubic yard; Item 10. For additional concrete, class A, in tunnel, complete, in place, $12 per cubic yard; Item 11. For additional concrete, class A, in open cut, complete, in place, $10 per cubic yard; Item 12. For additional concrete, class B, complete, in place, $8 per cubic yard, and Item 13 for the field office, complete, in place, $6,000. The Michudas being the lowest bidders were awarded the contract. Accordingly, on August 15, 1935, a contract was entered into between the Michudas and the Sanitary District of Chicago for the construction of that part of the southwest side intercepting sewer known as contract No. 4. The contract was on the form submitted by the District in connection with its solicitation of bids.

Work was begun by starting the excavation of the shaft on September 16, 1935. This shaft was located about 150 feet south of pit 25. It was about 85 feet south of the center line of the tunnel and about 150 feet west of Winchester avenue. Pit 25 was about 66 feet 6 inches north of the center line of the tunnel and 6 feet west of Winchester avenue. It was about 2,600 feet east of the west end of the tunnel and 5,000 feet west

of the east end. As they went down they first encountered soft yellow clay for a distance of about 10 feet, then soft blue clay for about 8 feet, then stiff blue clay for about 6 feet, then hard blue clay for 4 feet. From there they had hard pan for about 5 feet, containing boulders, then they struck rock 40 feet below the surface, about 4½ feet above the bottom of the required excavation. After they finished the shaft they drove what is called the drift tunnel. That is a tunnel which ran from the shaft to the line of the tunnel. It was driven north from the shaft for about 85 feet. The excavation was 10 feet 6 inches in height, and in that they encountered about 2½ feet of rock at the bottom, and above that hard pan with boulders in the lower 5 feet of the hard pan. The north end of this drift tunnel came to within 65 to 70 feet of pit 25. In the drift tunnel there was about the same amount of rock as in the shaft. The boulders varied from 6 inches to 2 feet in diameter. When the rock was encountered in the shaft, Michuda Jr. spoke to Kelly, one of the engineers for the District. He told Kelly they had encountered rock. He quoted Kelly as saying that he knew it and that test pit 25 did not indicate that rock would be encountered. Two days later Michuda went to Kelly again and told him that since the test borings did not indicate rock, he felt that they should be paid additional compensation for the extra work of mining the rock. Kelly said, ''Yes,'' and suggested that the contractors write a letter to the District's acting chief engineer. The letter was written and delivered. When the drift was completed, the contractors started work on the tunnel itself, and after progressing a short distance they worked in two directions at the same time, to the east and to the west. Each one is called a heading, and in digging both ways, they encountered about 5 feet of rock rising above the bottom, and on top of that, hard pan with boulders. Above the hard pan, at the start, the top was stiff blue clay. In the east head-

ing they continued to encounter rock for a distance of about 860 feet from where the drift reached the tunnel. The point where the drift reaches the tunnel is called the "I," and is the starting line from which they work both ways. The rock ran from 5 feet to 6 inches in a gradual tapering as the work progressed to the east. It was highest near the shaft and then tapered off until it no longer rose in the tunnel at a point just east of the 860 feet. They then proceeded about 300 feet east of the 860 feet without encountering rock. Then it cropped up again for a distance of about 50 feet to a height of about 2 to 2½ feet. Then for a distance of about 800 feet there was no rock, followed by about 160 feet of rock about 5 feet in thickness. After that there was no more rock in the east heading. Beginning at the I, above the rock was hard pan with boulders. This boulder condition reached from the rock upwards about 5 feet and extended all the way, continuously and uninterrupted, to the river, a distance of about 3,200 feet. Even where they ran out of rock they still had the boulders. From 25 to 50 per cent of this lower section of hard pan contained boulders from 6 inches to 6 feet in diameter. Just above the hard pan that was thus permeated with boulders, there was a layer of hard pan without boulders and above that came what the contractors call "soft top," by which term they meant that the soil above the hard pan in the top of the tunnel, was soft. The contractors also say that soft top is a clay which yields readily to forces that tend to deform or rupture it, and that it was from 5 to 6 feet thick and varied in consistency; that it varied from being so soft that it would drop through the grout holes in the steel plates erected to support the ground, and spread out on the floor of the tunnel, to about the consistency of a modeling clay. They first encountered the soft top in the east heading between 300 and 400 feet east of the I. It started with about 2 feet in thickness, and after going east about 300 feet it started to dip,

and then maintained a depth of 5½ feet to 6 feet to the east end of the tunnel. The tunnel extended east of the river about 1,375 feet. In that section also there was 5½ to 6 feet of soft top all the way, and there were boulders in about half of it. There was no rock. In the west heading they encountered rock from the I to a point about 275 feet west, of about 5 feet in thickness. Then it tapered to no rock within the excavation. On top of the rock there was hard pan, the lower 5 feet permeated with boulders all the way to the west end with the exception of about 100 feet. Above the boulder strata, the top was about what was shown on the chart. In the 100 lineal feet mentioned, the entire soil condition was as shown on the chart. On December 9, 1935, and again on July 21, 1936, the contractors wrote to the District, calling attention to the soil condition encountered, and stated that they would demand compensation for the extra cost. The contractors contend that it was necessary for them to expend large additional sums of money because of the more difficult and irregular soil conditions encountered. Various other expenses arose in connection with the work, which will be further considered. On April 26, 1937, the entire job had been completed and turned over to the district.

On July 29, 1937, the contractors filed their action for misrepresentation and fraud and in assumpsit against the defendant in the circuit court of Cook county. The complaint contains nine counts. The first count charges misrepresentation and fraud on the part of defendant in that the soil information chart furnished by defendant contained drawings of test pits, which represented that the test pits had been dug to a depth of 46 feet or more, and that the soil therein consisted uniformly of hard pan, with no boulders, when in fact the soil actually in those pits consisted of soft top, hard pan with boulders, and rock; that the statement as to the three test borings 25, 26 and 30, were falsely and fraudulently represented by the defendant; that plaintiffs re-

lied on the information given and were misled thereby; that their bid was based thereon; that the different soil condition caused the work to be more expensive, and thereby plaintiffs were damaged in excess of $400,000. The second count is based on the same allegations, but proceeds upon the theory of a breach of warranty by the defendant. It alleges that there was an implied warranty that the soil conditions shown on the chart were the actual conditions found in the test pits, and that there was a breach of this warranty in that the actual conditions were not as shown, but were as described therein. Count 3 has been withdrawn from our consideration. Count 4 is an assumpsit for extra and additional work. Count 5 contains two claims for compensation, one for removing concrete by chipping the invert (which is the floor of the sewer) because of mistakes made by defendant's engineers and inspectors in giving improper and erroneous grades and measurements. There is also a claim for damages caused by the delay of defendant in changing and revising the plans in reference to the location of piles for a bridge to be built by the State Highway Department. Counts 6 and 7 are common counts concerning matters previously alleged. Count 8 was also withdrawn from consideration. Count 9 was also a common count. The defense consisted of a general denial and also reliance on divers provisions of the contract. The case was tried before the court without a jury. At the close of plaintiff's case, the court allowed defendant's motions to strike certain of the evidence and to dismiss the action as to all counts except the one item of placing the piles covered by count 4. On this count the court entered judgment for plaintiffs in the sum of $964.15. This appeal by plaintiffs followed.

Under count 1, plaintiffs' theory is that the soil information disclosed on the chart which was exhibited by defendant and which defendant required plaintiffs to examine and heed, and upon which information plain-

tiffs relied and placed their bid and were induced to enter into the contract, was a positive misrepresentation, in that the test pits were not dug to the depth represented, and the soil conditions in the pits themselves were not as represented, by reason whereof the work done by plaintiffs cost them $400,000 more than it would have cost if conditions had been as represented. Their theory as to count 2 is that there was an implied warranty that the soil conditions shown in the test pits on the chart represented the actual conditions in the pits; that the fact that the pits were not dug to the depth represented and contained entirely different soil conditions from those represented, constituted a breach of warranty, by reason of which plaintiffs are entitled to recover the additional cost incurred. Plaintiffs' theory as to the one item alleged in count 4 is that the placing of the piles was extra work for which they should be compensated; that the amount allowed by the court of $964.15 and not disputed by defendant, is inadequate under the terms of the contract; that the amount so allowed by the court was the amount fixed by the defendant; that defendant had no right to arbitrarily fix the price and that plaintiffs were entitled to recover the actual cost. Plaintiffs' theory as to the claim set out in count 5 as to chipping the invert is that plaintiffs followed the measurements given to them by defendant; that such levels and measurements proved to be inaccurate and erroneous, by reason whereof plaintiffs were compelled to remove about 2 inches of concrete from the top of the invert for which they ask reimbursement of the cost. Plaintiffs' theory as to the delay in approving the plans for the river crossing is that the delay in approving the method of procedure for the river crossing was caused by an act not in contemplation of the parties when the contract was made, and that plaintiffs are entitled to recover the additional cost, damage and expense occasioned by the delay. Defendant's theory of defense as to the first

and second counts is that (1) there was no positive representation of a material fact, but on the contrary, a mere statement of belief as to the accuracy of the so-called soil information, which was expressly stated not to be guarantied; (2) that the statement, such as it was, was not made with the intent to induce or influence the plaintiffs to act upon it, but on the contrary, the statement and the provisions of the contract, as a whole, indicated definitely that the statement was not made with such intent; (3) that the statement of belief was not known to the defendant to be false; and (4) that that statement of belief was not such that the plaintiffs, as reasonably prudent men and reasonably experienced contractors, had a right in making their bid to rely upon it to the exclusion of all of the other provisions of the contract. In other words, plaintiffs failed to prove the necessary elements of an action for damages for either fraud and deceit or for breach of warranty. Defendant's theory of defense as to the "extra" for placing the nine wooden piles (count 4) is that the trial court allowed plaintiffs the full amount recoverable under the contract and the order of the engineer of the defendant, as authorized by the defendant. Defendant's theory of defense as to the extra for chipping the concrete from the invert, or floor of the tunnel (count 5) is that the necessity for this work did not result from erroneous levels and measurements given by defendant to plaintiffs, but was the result of plaintiffs' own carelessness and incompetence, and further, that plaintiffs did not comply with provisions of the contract, which compliances were conditions precedent to the establishing of a claim for extras against defendant. Defendant's theory of defense as to the extra or damages claimed for delay alleged to have been caused by defendant's failure to approve the method of procedure for the construction of the river crossing (count 5) is that whatever delay there may have been was not occasioned by the fault of defendant,

and, in any event, under the provisions of the contract, plaintiffs cannot recover damages for such delay because they did not comply with provisions of the contract, which compliances were conditions precedent to the establishing of a claim for extras or for damages against defendant.

Plaintiffs introduced evidence to show that the actual additional cost to them was $438,973.02. They assert that while it was a loss to them, defendant gained that much. They maintain that defendant represented that it had information of soil conditions derived from the actual excavation of test pits, and that the test pits had been dug to a depth which reached to the bottom of the proposed tunnel, and that the soil actually found in those pits was uniform in character and consisted of hard pan; that both of the representations were untrue; that the soil defendant did actually find in the test pits was anything but uniform; that such soil consisted of soft top, hard pan strewn with boulders and hard rock, and that such soil condition called for work of a wholly different character than was called for by the soil conditions defendant, untruthfully, represented were found in the pits. They say that the conditions encountered approximated very closely the conditions actually found in the test pits, and that had the soil information chart spoken the truth, all bids would have been governed by the more difficult character of the work to be done. They insist that defendant, by reason of the misrepresentation, got the job done cheaper by $439,000 than if it had told the truth, and that it got the job done that much cheaper at plaintiffs' expense. Plaintiffs do not contend that some rock might not be encountered. They concede that variations of soil were to be expected. Plaintiffs say that notwithstanding the assertion by defendant that rock would be encountered, the effect of the examination of the soil information chart was as if the defendant said to the plaintiffs, "You may encounter rock, but the test pits indicate

that there is no rock." Plaintiffs say that if the soil information chart showed the truth, plaintiffs would not have been misled. They declare that when defendant represented that the test pits along the line of the tunnel indicated only hard pan, and that such was a uniform condition, no person could reasonably be asked to anticipate a solid mass of rock for hundreds of feet, also soft soil for hundreds of feet, and a continuous mass of boulders throughout the whole length of the tunnel. Plaintiffs argue that if, for instance, pit 25 had shown rock to a depth of 4½ feet at the bottom, and boulders and hard pan for 4 or 5 feet above that, and pit 26 showed hard pan and blue clay as it did on the chart, it would indicate that somewhere between there was a change and that the soil was not uniform, in which event the bid would have been based on a lack of uniformity, and it might lead the contractor to make tests in between to endeavor to discover where the soil changed. Michuda Jr. testified that after examining the blueprint showing the soil information, he believed that the information given there was correct; that he believed the soil information as far as shown thereon was true and accurate; that the conditions as represented in the soil information chart were the determining factors upon which plaintiffs' subsequent bid was based. That was all the subsoil information obtained by the plaintiffs. Plaintiffs contend that the additional cost to them was due to the different and more costly method of procedure made necessary by reason of the more difficult and irregular soil conditions. There was no evidence as to how the Sanitary District acquired the information shown on the chart, whether from independent contractors who falsified the information, or how they got it, nor was there any evidence that the Sanitary District did not in good faith believe that the information was accurate. It is apparent from the contention of plaintiffs that they assumed, from the soil information chart, that the condition below the sur-

face would be uniform between test pits 25, 26 and 30. Plaintiffs urge that, in effect, if the soil information chart had shown the truth, plaintiffs in all likelihood would have made tests between pits 25, 26 and 30 before submitting their bids. Defendant calls our attention to certain circumstances which should be borne in mind in considering this phase of the matter. Test pit 23 was located in McKinley Park on the line of the contract. From that point (No. 23) east to pit 25 is about 1,700 feet, which is shorter than the distance between test pits 25 and 26, still further to the east. Test pit 25 was not on the line of the sewer. Test pit 23 indicates the presence of rock 51 feet 4 inches below the surface. In descending order, the drawing for pit 23 indicates "soil," probably black dirt on top; then clay or sand, without indicating whether hard or soft; then yellow clay, without indicating whether hard or soft; then loam, then blue clay, then hard pan and finally rock. Test pit 25 shows a couple of feet of black dirt, then stiff yellow clay for 12 feet, and in that 12 feet no sand or loam. Comparing pit 25 with 23, between elevations –20 and –35, there was in the latter hard pan and black sand, hard pan and gravel, hard loam, hard blue clay, while in the former it was all hard pan. To that extent there was no uniformity between pit 25 and 23. It will be observed that in the chart, the elevations are shown with plus and minus signs. Plus signs mean above city datum and minus signs indicate below city datum. City datum is the level of Lake Michigan as fixed by the federal government in the year 1815. Test pits 27 and 28, while a short distance removed from the line of the sewer, were on the chart, and were examined by Michuda, Jr. They were about 200 feet apart, but in the same relative stratum there was soft blue clay in pit 27 and medium stiff blue clay in pit 28. In pit 28, from elevation –19 to elevation –29, nothing is shown but hard pan, while in pit 27 between the same approximate elevations, blue clay,

gravel and small boulders are shown. To that extent, defendant points out that there was no uniformity between pits 27 and 28. The document introduced in evidence as plaintiffs' exhibit No. 2, and which the parties call the soil information chart, contains information for contracts Nos. 3 and 4. Contract No. 3 was awarded to S. A. Healy & Company. When plaintiffs figured on bidding, they had before them the soil information chart and had an opportunity to consider the information contained therein. Test pit 21, dug in the area covered by contract No. 3, showed the presence of rock only 24½ feet below the surface of the ground. Test pit 23, about 3,200 feet to the east, shows rock at 51 feet 4 inches below the surface. Leo Michuda, Jr. testified that, assuming the correctness of pits 21 and 23, the chart indicated on its face a variation in the level of rock of as much as 25 feet. Defendant also calls attention to the fact that the shaft was 48 feet below the surface of the street, and there was 4½ feet of rock in the bottom; the safety stairway was 42 feet deep and there was 3 feet of rock in the bottom, and that the two shafts were 80 feet apart. At the point where the drift tunnel opened into the main sewer, the rock, at 45½ feet below the surface, was 4½ feet thick. About 180 feet west of this point there was no rock. Then beginning still further west, it began to come in again, until at the west end of the sewer it was 3 feet thick in the invert, or bottom of the sewer chamber. Station 287 plus 47 was 869 feet east of the drift opening. In that distance, the rock sloped down from about 4½ feet until it ran out. Then, going east from station 287 plus 47 to station 290, there was no rock. Then rock was encountered at station 299 plus 60, a distance of 1,200 feet from the place where it ran out. From station 299 plus 60 to station 301 plus 20 is 160 feet. In that 160 feet, it came in, rose, and went out again. The distance between test pit 25 and 26 is about 2,481 feet. In that distance there was 1,410 feet where there was

no rock and 1,071 feet where there was rock, the rock encountered varying from about 5 feet above the floor level of the tunnel down to nothing.

Under the contract, work could only be begun after a proposed method of procedure had been prepared by the contractor and approved by the engineer of the defendant. The safety of the men engaged in underground work was a matter of prime concern, and the engineer was given the express right, under the contract, to require a modification of any method of procedure or equipment which he considered unsafe for the workmen or structures in the vicinity. The contract also provided that the work was to be carried on under the inspection of the P.W.A. engineers, whose principal concern was for the safety of the men employed. After the contractors had progressed approximately 800 feet in the east heading and 600 feet in the west heading, and about the time they struck soft top, they, plaintiffs, received a letter from the acting chief engineer. The letter called plaintiffs' attention to provisions in the contract, which, the engineer asserted, were not being observed in a manner satisfactory to the defendant and the inspection division of the P.W.A. He directed that the violations must be corrected before the work of constructing the sewer could be allowed to proceed. Adequate ventilation was to be provided. Gas tests had shown a dangerous concentration of carbon monoxide. The flooring was dangerous. Manholes had not been opened at points called for by the contract. The headings were dirty and dangerous. On January 27, 1936, there was a meeting at plaintiffs' office, attended by plaintiffs and engineers representing the defendant and the P.W.A. An engineer representing the defendant told plaintiffs that the method of excavation being employed was unsafe and would not be permitted to continue, and suggested that they look at the Healy tunnel to see how the work was being done there. Afterwards plaintiffs submitted

a new method of procedure that contemplated the driving of "monkey holes" and the use of "H-beams" and posts under the H-beams. This change of procedure was approved by defendant's engineer, and plaintiffs continued to use that procedure in most of the work remaining to be done. It is the contention of plaintiffs that the method of procedure which had been submitted by them to defendant, and which had been approved, was changed by order of the defendant to a more expensive and slower method because of the soil conditions encountered. The main difference in the method of procedure, after the receipt of the letter dated January 25, 1936, from the acting chief engineer, was the use of H-beams and posts, and the collateral work necessary for their use. Plaintiffs assert that if the soil conditions had been as represented, the method of procedure would have been as follows: The miners would begin digging at a line about the height of a man below the top of the excavation, and excavate the soil between there and the top. This was called the face of the tunnel. As they drove forward and removed the soil, it left the part below this line intact for a time to form a surface, a bench as it was called, on which the men could stand to operate. In describing the operation, plaintiffs called the face the upper 6 feet and all below that the lower 14 feet, as this roughly corresponds to the dimensions. As the work progressed in the upper 6 feet and the soil was removed, the ground above the excavation had to be supported. The contract required that this be done by steel ribs and plates. The ribs were I-beams bent in an arch so that when they were set on both sides of the tunnel they would meet at the top at the center line of the tunnel. These ribs were then tied together with liner plates so that the ribs and plates would form a complete steel lining, and thus support the ground at the sides outside of the tunnel and over the top of the tunnel and over the top of the arch. With soil conditions as represented,

the ribs would be set on the ground itself without any further support. In order to supply the place to set them, the miners when excavating the upper 5 feet would, at the same time, excavate the sides of the lower 14 feet to a line about half way between the top or bottom. That would be about 4 feet below the top 6 feet. By excavating to that point a bench would be left, about 10 feet above the bottom, and on a wooden block on that bench the ribs would be set. The ribs, thus, would be supported by the ground itself and could be set from 4 to 6 feet apart, in soil conditions as represented. The liner plates were steel plates, $\frac{1}{8}$ inch in thickness, and made in sizes of either 616 x 32 inches or 24 x 29 inches, with a 2-inch flange, so that they can be attached to one another when bent in the curvature of the arch of the tunnel. These plates are fastened to the ribs by means of bolts and thus when the ribs and liner plates are all connected it forms a solid steel top, which rests on the soil. Under soil conditions as represented, plaintiffs contend it would be possible to open up, dig out, from 12 to 14 feet of the upper 6 feet and the additional 4 feet in the lower part at the sides before the ribs and plates were set, as the ground would support itself. After the top and sides would be opened up to a distance of from 12 to 14 feet, the ribs and plates would be set, and then the miners would excavate the lower 14 feet to the proper outline of the tunnel. The soil on which the ribs were resting would be left in as a support for the ribs. All would be mined with air spades and breakers, and after the start, all of the work would be going on at the same time, that is, the miners would be excavating the top; others the bottom, the ribs and plates would be set all at the same time. Under such soil conditions there would be no occasion for steel H-beams. Under the soil conditions encountered, the method of procedure used and insisted on by the defendant, after the conference of January 27, 1936, was as follows: H-beams were used. These were steel

beams in the form of the letter H, and were put on that bench on the sides so that the ribs were set on the H-beams, which in turn, were supported by wooden posts instead of by the soil. The side bench was removed and posts substituted. The use of H-beams complicated the procedure. Instead of beginning the excavation with the whole of the upper 6 feet, it was first necessary to dig monkey holes so that the H-beams could be set. The monkey holes were excavations about 4 feet in height, the bottom being at the level of that side bench, about the middle of the tunnel measured from top to bottom. Before any other part could be excavated, these holes were dug something over 12 feet into the face of the tunnel, because the H-beams were 12 feet long. A monkey hole was dug on each side of the tunnel, and when the excavation had been driven a sufficient distance beyond the 12 feet, the H-beams were put in. All this had to be done before any other excavation was done in the tunnel. The H-beams were so set that the legs of the H-beams were in a vertical position, so that the ribs could be placed between the uprights of the H. After the H-beams were placed, the face,—the upper 6 feet,—was excavated, but because of the soft condition of the top it was impossible to dig more than 2 or 4 feet at a time (instead of 12 to 14 feet) before the ribs were set in the H-beams and the plates put in. When the ribs and plates were set the contractor started to mine the lower 14 feet, and in doing this had to remove the soil from under the H-beams as they went along, and had to support the H-beams by wood posts 6 x 8 inches in cross sections. This was necessary to furnish support for the liner plates and the load above it and to transmit that load to the bottom of the tunnel. This was done principally because the soil at the H-beam was not of sufficient bearing capacity to carry the load above it. But the presence of boulders also affected it because with boulders in the sides of the tunnel, in order to excavate

and get a theoretical section of the grade, it was necessary to dig the boulders out of the side, and that would destroy the bearing capacity of that soil. The placing of the posts was a tedious and complicated job. Where boulders were between the tunnel excavation and the outside of the tunnel, they had to either break off the boulder by drilling and then using a steel wedge and sledge hammer, or, if the boulder was not too large it would be mined out of the side of the tunnel. They would dig around it with air spades, or if the boulder was too large, they had to drill holes and use dynamite and blast the boulders from the sides. Plaintiffs insist that if the soil was hard pan, as represented, none of those things would have been necessary. Because of the rock condition, they could not use the shovel in disposing of the rock without blasting. They had to drill holes in the rock and blast with dynamite. This required additional men who were used solely for that purpose. When a blast would be set off, all the men that were working in the tunnel would have to stop work, all the equipment that could be removed would have to be taken out, and the other equipment protected with timbers so that it would not be destroyed. Then all of the men would have to wait from 20 minutes to a half hour until the gases cleared away.

At the time of the conference on January 27, 1936, the conferees inspected the tunnel. Michuda, Sr. then asked what was necessary in order that they could proceed with the construction. The engineers representing defendant told him that before he could go ahead, they must drive monkey holes on each side of the tunnel and use H-beams upon which the foot plates of the liner plate ribs rested and support the H-beams with 6 x 8 posts spaced not more than 3 feet on centers. Plaintiffs objected to the order. Dan O'Connor, plaintiffs' superintendent, an experienced man who had been working in tunnels for about 60 years, testified that in his opinion it was not necessary to use H-beams and

posts because the shelf would carry the load if the top would carry it, and they could shove it up or hold the top by a log going out into the side walls and putting blocking under the log; that they carried a heavier load on another Sanitary District tunnel job without using ribs, logging and plates, and that he, O'Connor, never used H-beams or posts. Defendant's engineer, however, insisted on his position and ordered plaintiffs to submit a drawing showing the H-beams and posts. That was done, the H-beams and posts were ordered and from then to the completion of the job, that was the method of procedure. Plaintiffs proceeded with the work, meeting all kinds of difficulties, due to the character of the soil, especially the soft top. The ground above the excavation would settle so rapidly that it would press down the steel framework of ribs and steel before the concrete could be poured. Sometimes it even bent and buckled the plates and ribs. Then the plates would have to be burnt out so as to remove more dirt to make room for the required thickness of concrete.

Plaintiffs contend that during all of this time they had no idea that the soil information chart misrepresented the soil conditions existing in the test pits and borings; that while there probably was some puzzlement that the soil conditions encountered should be so radically different from those disclosed on the chart, it was not until about June 22, 1936, that suspicions were aroused that all was not what it was pretended to be. On that day they reached pit 26, which is shown on the chart and plans as coming right into the tunnel. Michuda, Jr. and one of his assistant superintendents, and the shift engineer for the defendant, examined the spot in the tunnel. The tunnel excavation had reached that point and the outline of the pit clearly appeared. The sketch of the pit on the soil information chart represents that it was dug to a depth of minus 33.0 feet. This means 33 feet below city datum. The sur-

face of the ground was plus 13. The drawing showed that the pit was dug to a depth of 46 feet, which would take it through the tunnel strata to a point below the bottom of the excavation. It is also shown as extending below the bottom on one of the sheets attached to the plans and specifications. On June 22, 1936, the plaintiffs discovered that the pit had been dug only to within 8 feet of the bottom of the tunnel. The excavation of the pit stopped one foot below the H-beams. It was dug something over 8 feet less in depth than represented and purported to show the character of the soil in that 8 feet. The drawing shows that in that 8 feet the soil was hard pan and shows no boulders. The drawing shows that the entire strata in the whole tunnel at this point from top to bottom and above the top of the tunnel to 5 feet above city datum, was uniform hard pan without boulders. What they actually found there was a very soft top extending down about 5 feet below the top of the tunnel. There was no indication of this on the chart, and yet whoever dug the test pit, dug right through the soft top. When the discovery was made the contractors had excavated about 2,500 feet in the east heading and the west heading was nearing completion. Only about 1,300 to 1,500 feet remained to be done in the east heading to complete the whole job. On April 26, 1937, the whole job had been completed and turned over to defendant. Having in mind the discoveries relating to pit 26, the plaintiffs sought the location of pit 25 and boring 30. Through their attorney, they got the exact location of pit 25, but the location of boring 30 could not be found. On April 26, 1937, plaintiffs examined pit 25. They dug within the boundaries of the pit and made a record of what they found. The pit had been back filled and they took this out. When they reached a point 34 feet below the surface, they struck virgin soil; that is, they found that the excavation had been made to a depth of only 34 feet. The drawing on the chart represented

that they had dug to a depth of 49 feet. Not wishing to disturb the soil below, they dug no further, but used a coal augur drill and drilled through the hard pan they found at the bottom of the 34 feet at 4 points. The drill stopped at a depth of 3 feet (being 37 feet below the surface) and the sound made by the drill indicated rock. That is as far as they went. They back filled and took the men off the job. It took six days to go that far. After the instant suit was started, defendant caused pit 25 to be redug in the presence of Michuda, Jr. and his assistant superintendent. The men who did the digging took out the backfill until they reached a depth of 34 feet below the surface where they hit the virgin soil, hard pan. They went down an additional 3 feet and brought up hard pan. Then came hard pan mixed with boulders. They continued to bring up hard pan mixed with boulders of all sizes until they reached a point 41 feet 6 inches below the surface where they struck rock. Hence, plaintiffs say that the soil conditions actually in pit 25 were precisely the soil conditions found in the shaft, the drift tunnel, the first 400 feet in the east heading and the first 200 or 300 feet in the west heading. Plaintiffs urge that if defendant had honestly dug to the depth represented and had honestly indicated on the chart what was in the pit, they would have indicated precisely what they found in the tunnel in that vicinity. Plaintiffs argue that from the representations they had a right to and did expect to encounter stiff clay and hard pan, just as they would have expected to encounter, and would have encountered hard pan with boulders and rock underneath, if the contents of the pit had been honestly disclosed. They maintain that the soil information chart led them to believe that there would be uniform stiff clay and hard pan without boulders, and declare that another thing which showed that the character of the soil above the top of the tunnel was different than shown on the chart, appeared when a manhole was dug

within 5 feet of pit 26. They found very soft yellow clay from 12 feet below the surface to 29 feet 6 inches below the surface. After the redigging of pit 26, defendant caused a pit to be dug near where pit 26 had been. From the surface downward 12 feet they found about 4 feet of backfill and the rest was soft yellow clay. Then came soft blue clay to about 21 feet 6 inches below the surface; then 2 feet of soft slimy blue clay to about 30 feet 6 inches below the surface, then they ran into stiff clay and boulders; then hard pan and boulders. Plaintiffs were never able to locate pit 30. It appears that defendant was not able to locate it either. The soil information chart shows that pit 30 is a short distance east of the east end of the tunnel and almost directly in line with it. While plaintiffs could not locate it, they did see the soil at the east end of the tunnel. On November 2, 1936, plaintiffs had reached a point about 200 to 250 feet west of the east end of the tunnel. There they encountered soft clay top and hard pan with boulders. This condition ran right to the east end of the tunnel. Plaintiffs maintain that this is some indication of what would have been found in pit 30, if it had been located and redug. When the redigging of pit 25, and the digging of the new pit near 26, by defendant, had been completed, defendant caused a pit to be dug in the vicinity of Racine avenue and Pershing road. It was 15 feet north of the north face of the 39th street viaduct and 222 feet west of the west curb of Racine avenue. This was about 240 or 250 feet northwest of the end of the tunnel. They found soft yellow clay top, then soft blue clay, then crumbly hard pan mixed with gravel and water, then hard pan with boulders. Pit 23 is in the tunnel line in the west heading. The drawing on the chart fairly accurately shows the same condition of the soil as was encountered, except that it does not show boulders and boulders were there.

The first point advanced by plaintiffs is that the

representations on defendant's soil information chart were positive representations of fact upon which plaintiffs had a right to and did rely on; that such representations were untrue, and that the precautionary provisions of the contract have no application and plaintiffs are entitled to recover. Plaintiffs place great reliance on the case of *United States v. Atlantic Dredging Co.,* 253 U. S. 1. They assert that they made no test of soil conditions of their own because the soil information was furnished by defendant with the statement that it was believed to be accurate. They urge that defendant had the soil information and required plaintiffs to examine it; that the soil conditions were the basis of the whole contract; that upon those conditions depended the cost, and by representing the condition as uniform hard pan defendant obtained a bid which obviously it would not have obtained had the truth been told, and that to allow the difference to plaintiffs now is simply to allow them what the actual cost was and what defendant would have been required to pay in the first place if it had shown, not necessarily what actual conditions were found in the tunnel, but simply what the soil conditions in the pits actually were. Defendant answers that the complaint filed by plaintiffs necessarily recognized the essentials in pleading and proving a case based on an action at law for damages for fraud and deceit. Under the authorities, in an action grounded on fraud and deceit it is incumbent upon the plaintiff to prove six elements, namely: (1) The misrepresentation must be in form a statement of fact; (2) It must be made for the purpose of influencing the other party to act; (3) It must be untrue; (4) The party making the statement must know or believe it to be untrue; (5) That the person to whom it is made must believe and rely on the statement; and (6) The statement must be material. (*Johnston v. Shockey*, 335 Ill. 363; *Crocker v. Manley,* 164 Ill. 282.) In the drafting of their complaint plaintiffs recognized the necessity for setting out all of the

enumerated elements. It is plaintiffs' position that the so-called soil information chart misrepresented the conditions that actually existed, and thereby plaintiffs were misled to their injury. On the soil information chart, in large type and plainly discernible, appears the statement: "This information is believed to be accurate but the Sanitary District of Chicago does not guarantee it." It must be remembered that prior to the submission of the bids, the bidders were handed the booklet containing the proposals, specifications, contract, bond and plans. They had an opportunity to read the entire document and to study it. Section 13 states that "On file in the office of the Engineer is certain data relating to soil conditions to be encountered along the route of the work. While this information is believed to be accurate, the Sanitary District does not guarantee the same. The Contractor must satisfy himself by making borings or test pits, or by such other methods as he may prefer as to the character, location and amounts of water, peat, clay, sand, quicksand, gravel, glacial drift, boulders, conglomerate, rock and other material to be encountered and work to be performed." It is plain to us that this statement in the contract negatives any idea that the defendant designed or intended that the contractor should rely solely on the soil information chart on file in the engineer's office. In the instructions to the bidders they were informed that they must carefully examine the entire site of the work and adjacent premises and inform themselves thoroughly as to the difficulties involved, and that no plea of ignorance of conditions or difficulties that may be encountered in the execution of the work as a result of failure to make the necessary examination and investigations would be accepted as an excuse for any failure or omission to fulfill in every detail all of the requirements of the contract, specifications and plans, or would be accepted as a basis for any claims for extra compensation. Bidders were also re-

quired to determine for themselves the quantities of work required, the conditions under which the work would be performed, and they were plainly told that they would have to assume the risk as to the variations in the quantities of the different classes of work. It will also be observed that section 13 which we have quoted, does not contain a statement or intimation that "certain data on file" was gathered or supervised by the defendant, nor is there a positive affirmation that the data on file is accurate. On the other hand, there is a positive statement that while the soil information is believed to be accurate, the Sanitary District "does not guarantee the same." When we carefully read and consider the soil information chart, the instructions to bidders and the contract, we arrive at the conclusion that the defendant, in making the information on the soil chart available to contractors, including plaintiffs, was not making a positive representation of fact, but was stating a belief which it had of the accuracy of the information, but which belief it was unwilling to guaranty as to its accuracy.

The second proposition discussed under point one was the alleged representation made by defendant for the purpose of inducing plaintiffs to act upon it to the exclusion of all other provisions of the contract. The documents prepared by defendant for the solicitation of bids were, in our opinion, prepared with great care in order to caution prospective bidders that no representations were being made by the District, and that the bidder must, by tests, inspections and information which he would acquire, decide on the kind of a bid to submit. Fraud is never presumed, but must be proved, like any other fact, by clear and convincing evidence. Something more than mere suspicion is required to prove allegations of fraud. Fraud is never presumed when transactions may be fairly reconciled with honesty. (*McKennan v. Mickelberry*, 242 Ill. 117, 134.) The rule is well established that public officials in the per-

formance of official acts are presumed to act in good faith and with honest motives. (*Tribune Co. v. Thompson,* 342 Ill. 503, 529.)

The next inquiry is, "did the defendant know or believe that the information was false." As previously outlined, there is no evidence in the record that tests and borings were made by the defendant. Plaintiffs had ample opportunity to make test pits and borings before submitting their bid. They had equal means or knowledge with defendant for finding out what was in the line of the tunnel which was to be excavated. Defendant clearly informed all prospective bidders that it was not guarantying the accuracy of the information on the chart. The next inquiry is, "did plaintiffs, acting as ordinary and reasonable men and experienced contractors in underground excavation work, have the right to rely and act solely upon the soil information chart in the face of the provisions of the contract and without themselves making any examination whatever of subsurface soil conditions." There was plenty of time to dig test pits and to make borings. The defendant knew that the proposed contract called for the construction of a concrete sewer to be dug in earth and rock, and that the bidder was required to satisfy himself by borings, test pits, or such other method as he might prefer, as to the character, location and amounts of water, peat, clay, sand, quicksand, gravel, glacial drifts, boulders, conglomerate, rock and other material to be encountered. The bidder was also informed that the soil data on file indicated that rock would be encountered. Other provisions of the instructions to bidders and the contract, which have heretofore been set out, make it quite plain, in our opinion, that the plaintiffs did not have the right to rely solely on the soil information chart.

The second criticism leveled at the judgment is that the court erred in granting defendant's motion to strike the evidence. Plaintiffs insist that the testimony was

competent, relevant, material and admissible because the claim was based on misrepresentation, and was not a suit on the contract. In view of our conclusion that the testimony taken in its most favorable light from the standpoint of plaintiffs, does not make out a case, we think it is immaterial whether we consider it as stricken or standing. In our discussion up to this time, we have considered that the evidence was competent. We recognize that parol evidence is admissible to show that the making of a contract was procured by fraudulent misrepresentations. Under point three plaintiffs say that proof that defendant knew that the representations as to soil conditions were false, need not be made where it appears that defendant stated a material fact, not knowing whether it was true or not, or where such representations relate to facts which must be supposed to be within defendant's knowledge. Under this point plaintiffs also urge that there was a positive representation as of defendant's knowledge of the facts as to soil conditions found in the pits themselves, a declaration of the belief of defendant that the representations were true, and that the foundation for the belief was the test of actual pits and borings; that in fact, the representations were untrue, and that, therefore, the defendant is liable. We are of the opinion that our discussion of the previous points covers point three.

The fourth point urges that plaintiffs established a case under their second count, which relies on a warranty. The parties agree that in an action for damages for breach of warranty, unlike an action for false representations and deceit, it is not necessary that the plaintiffs prove that the warrantor knew that the warranty he made was false. Plaintiffs insist that the defendant warranted that the result of the borings was as shown on the soil information chart. To establish an action for damages for breach of warranty, it is necessary to prove (1) that the alleged warrantor made a definite and positive assertion of a material fact; (2)

that the alleged warranty was made for the purpose of inducing the one to whom it was made to act upon it and to rely on it, and (3) that the alleged warranty was such that a reasonable prudent person would rely upon it and that plaintiffs did rely upon it. There are two kinds of warranties, express and implied. As the contract expressly states, ''while this information is believed to be accurate the Sanitary District does not guarantee the same,'' it is manifest that plaintiffs assert an implied warranty. We are unable to understand how plaintiffs can contend that there was an implied warranty when the contract and the soil information chart state that while the information is believed to be true, the defendant does not guaranty the same. It is quite clear that plaintiffs did not make out a case under their charge that there was an implied warranty.

The fifth point relates to the river crossing. Plaintiffs bid and were awarded the contract to perform this work for a lump sum payment of $62,947. The river crossing was the section of the tunnel which crossed beneath the west arm of the south fork of the south branch of the Chicago River. Plaintiffs asked the sum of $4,590.98 in connection with the placing of nine wooden piles at the river crossing. The court entered judgment for them for the sum of only $964.15, and their objection to the amount allowed is embraced in this appeal. Specifications for the work of the river crossing did not include or require plaintiffs to place the wooden piles for the highway bridge. This highway bridge was to be built by the State Highway Department across the same arm of the river at the place where Pershing road intersects the river and just south of where the river crossing section of the tunnel was to pass beneath the river. The plans attached to plaintiffs' contract show the river crossing section of the tunnel to be entirely separated from the 20 rows of piles forming the highway trestle across the river, but this requirement of

the plans was afterwards changed and altered by an agreement between the Sanitary District and the State Highway Department that the north row of nine piles should be moved further north into the line of the tunnel and should be encased in the concrete forming the walls of the tunnel and thus become monolithic with the tunnel itself. The negotiations carried on between the defendant and the State Department of Highways, plaintiffs contend, delayed the approval of their plans of procedure at the river crossing, and prevented work on the river crossing until after cold weather had set in and eventually caused the stopping of the work on the tunnel for three weeks. On November 4, 1935, plaintiffs transmitted a letter to the chief engineer of defendant, asking his approval of a method of procedure for the river crossing. On November 12, 1935, they sent another letter to the chief engineer, asking to be advised as to what decision had been reached in regard to the location of the piles for the highway bridge, and further stated that they must have the information before they could proceed with the construction of the cofferdam. In the construction of the river crossing it was necessary that the plaintiffs construct a cofferdam. The letters were answered by defendant on January 13, 1936. The chief engineer then approved certain methods of procedure, and inserted one, numbered 9, reading: "Piles furnished by State Highway Department shall then be placed and concreted as ordered in future communications." About this time defendant gave to plaintiffs a blueprint dated January, 1936, showing the layout of the State highway bridge with respect to the cofferdam constructed for the river crossing, and showing that the north row of piles was to be moved north and into the cofferdam. On April 10, 1936, plaintiffs, at the request of the chief engineer of defendant, submitted to him in writing an itemized statement of the costs which would be incurred by plaintiffs in the placing of the piles. These costs so submitted totaled $3,-

780. On May 14, 1936, the chief engineer wrote plaintiffs that as authorized by the board of trustees ''You are hereby ordered to place 9 piles required for the north side of the proposed bridge across the river,'' and further directed the method of doing the work. The letter specified that the earth excavation, concrete and reinforcement steel should be paid for at the unit price for items 9, 11 and 5 of the contract, and that all other work and materials should be paid for on a force account basis under extra work, but not to exceed $300. On the day the letter was sent, the board of trustees of defendant adopted a resolution reciting that the committee on engineering had received a letter from the acting chief engineer requesting authority to order the contractor to perform the work as an extra, and ordering that the acting chief engineer be authorized and directed to order the Michudas to perform the work specified at the appropriate unit prices for additional earth excavation, class A concrete and reinforcement steel, and on a ''force account'' basis for all other work required at a cost not to exceed $800 for the latter work as an extra under the said contract. Plaintiffs wrote the engineer that they refused to accept the offer contained in the letter for the placing of the piles at the river crossing. However, in compliance with the engineer's order and pursuant to the method of procedure for the construction of the river crossing, as approved by him, plaintiffs in proceeding with the river crossing did place the piles as directed. The court allowed for the excavation of the nine wooden piles, only $17.28, or $1.92 for each pile for excavating by hand a pit 2 feet in diameter and 16 feet in depth below the river bottom. This was on the basis of the unit price under item 9. Plaintiffs contend that it is unfair to apply the unit price to this work, and that the actual cost of the excavation work alone was in excess of $200. Plaintiffs offered to prove the specific amount of actual cost involved in the work. They contend that to the amounts

so proved should be added 15 per cent to the cost of material and 10 per cent to the cost of labor, as provided for in the contract. Article 6, page 61, of the contract provides that no extra work, the total price of which is in excess of $500 shall be performed by the contractor until the engineer is authorized by the board of trustees to issue a written order therefor. A provision of the article states that if the extra work done under the contract is of such a nature, being distinct from other work being done by said contractor, that the engineer can determine the actual cost of the same, then the contractor shall receive, in full satisfaction for the same, the actual cost of the work as determined by the engineer, with 15 per cent added to labor items and 10 per cent added to material items to cover superintendence and use of ordinary tools, and for profit, provided that nothing shall be deemed extra work, which in the opinion of the engineer, can be classified and measured under the provisions of the contract and paid for at unit prices. The article also states that "no percentage shall be added to any unit or lump sum price fixed by the Engineer for extra work performed by the Contractor." In our opinion, the court correctly applied the unit price to the additional excavation, additional concrete and additional reinforcement steel, and correctly allowed the $800 as limited by the Sanitary District resolution, or a total of $964.15. We have carefully examined the contract and are of the opinion that the court followed the terms thereof in fixing the amount allowed for the extra work in connection with the river crossing. Plaintiffs insist that the amounts fixed are unfair to it, particularly in view of the provision that "the Engineer shall fix such prices as he shall consider just and equitable." They insist that the prices were fixed, not by the engineer, but by the resolution of the board. It was necessary for the engineer to submit the proposal to the board because the cost of placing the nine piles was in excess of $500. However, it is

manifest that the judgment as to the amount to be allowed for the extra work was the judgment of the engineer and not the judgment of the board. It will be noted that the engineer in directing the performance of the work, stated that the additional earth excavation, concrete and reinforcement steel should be installed at the unit prices of the contract, and that work other than the excavation, concrete and reinforcement steel should be performed on a ''force account'' basis, but with the limit of $300 therefor. Obviously, this was a typographical error, as the limit should have been $800, as stated in the resolution.

The sixth contention of plaintiffs is that the chipping of the invert was extra work made necessary by the engineers of defendant giving improper and erroneous grades and measurements to plaintiffs. They urge that where the necessity for extra work results from the acts, errors and mistakes of the architect or engineer of the owner, under whose supervision the work is to be done, the loss should fall on the owner, and the contractor may recover additional compensation and is not confined to the rate of compensation provided in the contract for similar work. Plaintiffs claim additional compensation of $3,091.23 for chipping the invert, which they claim was made necessary by defendant giving erroneous grades. The invert is the concrete floor of the tunnel. As the work progressed the rough invert was put in and the rough invert was laid throughout the entire length of the heading of the tunnel before the finished top was put on. Plaintiffs were required to put on a finished top of 1½ inches. For laying the rough invert, defendant's engineer would, each day, bring in the grade from a bench mark that was established back in the completed tunnel, and from that mark he would transfer the grade to the heading itself. All measurements were given by the defendant's engineer. The rough invert was poured by plaintiffs according to directions, and it was not until the tunnel

had been finished, with the exception of the finished top of the invert, and plaintiffs were putting on that finish, that it was discovered that a mistake had been made, in that the rough invert was higher than it should have been between stations 280 and 300, a distance of 2,000 feet. The mistake was discovered on December 1, 1936. To remedy the excessive height of the invert it was necessary for plaintiffs to chip off the extra concrete, amounting to an average of two inches, so that there would be sufficient room to put on the finished concrete and so that the finished concrete would be at the proper elevation. The contract required and the contractor did assign a qualified technical engineer to act as a contact man with the engineer. The concrete was too high beginning at about 220 feet east of the "I" and extended 2,000 feet east to station 300. The east end of the tunnel was approximately 2,700 feet still further east of where the high concrete in the floor stopped. There is no claim that any concrete had to be chipped from the floor of the tunnel in the west heading. Leo Michuda, Jr. testified that the finished top would vary from 1½ inches to 3 or 4 inches, depending upon the amount or depth of concrete that had to be put in in order to bring the concrete up to the finished grade. He testified further that when he said the invert had to be chipped on an average of 1½ inches, he meant that in some places it was 1½ inches too high, in some places 2 inches too high and in some places 2½ inches too high. The contract provided that "all objects and marks defining lines and grades shall be carefully preserved." There is no evidence to show whether they were or not. Section 12 of the general specifications provided that "controlling lines and grades will be established by the Engineer, but the contractor shall provide such materials and give such assistance as may be required, and all objects and marks, defining lines and grades shall be carefully preserved." Section 15 of the general specifications pro-

vides that "any imperfect work that may be discovered before the final acceptance of the work shall be corrected immediately," and that "all work which . . . fails for any reason to satisfy the requirements of the specifications shall be removed and replaced by good and satisfactory work without extra charge therefor." Section 72 provides that "all deviations from the lines, grades, cross sections and details shown on the plans, or ordered by the Engineer, shall be similarly corrected by the contractor in a manner acceptable to the Engineer," and that "no additional payment shall be made to the contractor for cutting out or removing defective concrete or correcting defective work as herein specified." Section 73 provides that "before final acceptance of the work, all defective concrete work . . . shall be neatly repaired without extra charge therefor to the Sanitary District." Whether we consider the testimony as being in the record or being stricken, we are of the opinion that as a matter of law under the contract and under the facts, the plaintiffs are not entitled to recover for the expense they incurred in chipping the invert in order to bring it to the proper height.

Finally, plaintiffs maintain that they were delayed by the change and revision made in the plans by defendant, and the consequent failure of defendant to approve the method of procedure for the construction of the river crossing, and that this was a direct interference by defendant by an act not in contemplation of the parties when plaintiffs were induced to make their contract. Hence, plaintiffs say that they are entitled to recover the additional cost, expense and damage occasioned by the delay. Here they are proceeding outside of the contract. Their claim is for $14,292.53. Plaintiffs state that in order that there would be no stoppage on the work of the tunnel, thus necessitating carrying idle men on the payroll, idle machinery and equipment, etc., it was necessary for plaintiffs to begin work on the river crossing early enough to enable them

to finish it by the time the tunnel excavation reached the west bank of the river, otherwise, the plaintiffs would be unable to proceed with the excavation and construction of the tunnel eastward from the east bank, in which event their men and machinery would be idle. They point out that on October 8, 1935, they sent drawings to the engineer. A few days later Michuda, Sr. called on defendant's representative. The engineer told Michuda some difficulty arose with regard to the piles and that they were trying to arrange with the State Highway Department about the location thereof. About November 15, 1935, Michuda again called on the engineer. Defendant's engineer said they would not let the Highway Department drive the piles close to the tunnel because that might fracture the walls of the river crossing. Michuda again said he had to have the approval of the engineer immediately. The engineer told him that the approval could not be given until the matter was settled with the Highway Department. Plaintiffs urge that the approval was withheld on the sole ground that the defendant would not allow a third party, the Highway Department, which had no connection with the contract, to drive the piles at the location shown on the drawings attached to the contract. Plaintiffs state that the change in the placing of the piles had nothing to do with their contract. The placing of the piles had solely to do with the construction of the bridge. On January 13, 1936, the method of procedure was approved by the engineer. The dispute between the Sanitary District and the Highway Department was finally adjusted by changing the location of the nine piles so as to require plaintiffs to place them in the wall of the tunnel. Detailed proof was made of the cost to plaintiffs. Plaintiffs insist that the delay was due to the act of interference of defendant and was brought about by a matter not within the contemplation of the contract. Defendant declares that the driving of the sheet piling for the cofferdam was

let to a subcontractor; that the approval of the sub-contractor was not asked for by plaintiffs until November 4, 1935; that approval was given November 5, 1935; that the approval of the material men who were to furnish the sheet piling was not asked for until November 19, 1935, and November 25, 1935, and that these approvals were given on November 23, 1935, and November 27, 1935, respectively. On December 27, 1935, plaintiffs submitted a new and revised plan for the cofferdam. The letter of approval of January 13, 1936, was in reply to plaintiffs' letters and submissions of November 4, 1935, November 12, 1935, and December 27, 1935. Plaintiffs' testimony was that on January 13, 1936, it was too cold to start work on the river crossing and that the actual work did not start until February 4, 1936; that the cofferdam was not finished until August 18, 1938; that all of the underground work in the east heading of the tunnel had been finished up to the west bank of the river on July 28, 1936, and that all work stopped in the east heading of the underground tunnel from July 28, 1936, to August 19, 1936. Michuda, Jr. testified on direct examination that the weather conditions prevented plaintiffs from working on the tunnel from January 17, 1936, to February 4, 1936; that from February 4, 1936, to August 19, 1936, their work proceeded without any delays occasioned by their fault, and that there was no work done in the east heading between July 28, 1936 and August 19, 1936. Defendant declares that these claims did not withstand the cross-examination. It appears that despite the claims of plaintiffs, they did not shut down all work in the east heading from July 28 to August 19th. Article 25 of the contract provides that "Should the Contractor be obstructed or delayed in the commencement, prosecution or completion of the work hereunder by any act or delay of the Sanitary District ... or by acts of public authorities, ... or to other causes, which ... the Engineer shall determine to be entirely

beyond the control of the Contractor, then the times herein fixed for the completion of said work to the extent specified shall be extended, . . .

"It is further expressly understood and agreed that the Contractor shall not be entitled to any damages or compensation from the Sanitary District on account of any delay or delays resulting from any of the causes aforesaid . . . , except compensation for extra premiums paid by the Contractor on his bond and for wages and salaries of employees and other extra expenses of the Contractor that is necessary only for the proper maintenance of the work and of the plant and equipment of the Contractor during or on account only of a delay or delays caused by the Sanitary District . . . or by Public Authorities as aforesaid. The Engineer shall determine the number of days, if any, that the Contractor has been so delayed and the amount of such extra costs to the Contractor due to said delay or delays and the amount of extra compensation to be paid to the Contractor therefor, and his decision shall be final and binding upon both parties to this contract." The record does not show that delay in performance was reported to the engineer until after plaintiffs claimed they had fully completed their contract and had been paid all that the defendant considered was due them. In fact, no claim was reported until after they had engaged attorneys to present additional claims against the Sanitary District, nor was the engineer called upon by plaintiffs to determine the number of days of any alleged delay, or to fix the extra compensation to be paid therefor. We are of the opinion that the action of the court in finding against the plaintiffs on this claim was proper.

Counsel made an exhaustive search for authorities bearing on the propositions in dispute. While we have not commented on the cases cited, we have carefully read them. Due to its importance and the voluminous record, the opinion is necessarily very lengthy. It

would be extended to even greater lengths if we undertook to analyze and differentiate the cases that have been so well presented by the able counsel representing the respective parties.

For the reasons stated, the judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

HEBEL, J., and DENIS E. SULLIVAN, P. J., concur.